IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,021

STATE OF KANSAS,
*Appellee*,

v.

TREVEJON M. KILLINGS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Second-degree intentional murder is a lesser included offense of premeditated first-degree murder because the only difference between the two crimes is the element of premeditation.

2.

Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation. Further, it is not necessary that there be direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable. In other words, intent may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his or her acts.

1

3.

Kansas caselaw identifies factors to consider in determining whether circumstantial evidence gives rise to an inference of premeditation. These factors include: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) the threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. But the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. Use of a deadly weapon by itself, however, is insufficient to establish premeditation.

4.

Second-degree reckless murder is the killing of a human being committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life. In other words, second-degree reckless murder is a killing of a human that is not purposeful, willful, or knowing but which results from an act performed with knowledge that the victim is in imminent danger, although death is not foreseen. Second-degree reckless murder is a lesser included offense of premeditated first-degree murder.

5.

Prosecutors enjoy wide latitude in crafting closing arguments. This latitude allows a prosecutor to make reasonable inferences based on the evidence, but it does not extend so far as to permit arguing facts not in evidence. For instance, prosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law. Arguments must remain consistent with the evidence. If they are not, the first prong of the prosecutorial misconduct test is met, and an appellate court must then consider

whether the misstatement prejudiced the jury against the defendant and denied the defendant a fair trial.

6.

It is improper for a prosecutor to suggest during closing arguments that the defendant should have waived his or her right to a jury trial based on the strength of the State's evidence.

7.

It is improper for a prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof. But prosecutors are granted considerable latitude to address the weaknesses of the defense.

8.

When a prosecutor's comment constitutes only a general question about the absence of evidence to rebut the State's witnesses and not an impermissible remark about the defendant's failure to testify or an attempt to shift the burden of proof to the defense, the comment is within the wide latitude afforded to the prosecution.

9.

A prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case.

10.

It is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, including the defendant. A prosecutor, however, may explain the legitimate factors which a jury may consider in assessing witness credibility and may

argue why the factors present in the current case should lead to a compelling inference of truthfulness.

11.

It is proper for a prosecutor to argue that, based on the evidence, the defendant, by providing an implausible alibi, was not taking responsibility for his or her actions and the jury should hold the defendant accountable.

12.

A criminal defendant has a constitutional and statutory right to be present at all critical stages of his or her trial. A conference between a trial judge and a juror is considered a critical stage of a trial. Furthermore, K.S.A. 22-3420(3) requires that any question from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is voluntarily absent.

13.

Kansas' statutory procedure for imposing a hard 50 life sentence as provided in K.S.A. 21-4635 violates the Sixth Amendment to the United States Constitution as interpreted in *Alleyne v. United States*, 570 U.S. __, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), because it permits a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt.

14.

The propriety of retroactively applying the amended hard 50 sentencing scheme set forth in K.S.A. 2013 Supp. 21-6620 after an appellate court vacates a hard 50 life

sentence imposed pursuant to K.S.A. 21-4635 will not be ripe for appellate review until a prosecutor chooses to pursue such a sentence upon remand for resentencing.

15.

An inmate who has received an off-grid indeterminate life sentence can leave prison only if the Kansas Prisoner Review Board grants the inmate parole. Therefore, a sentencing court has no authority to order a term of lifetime postrelease supervision in conjunction with an off-grid indeterminate life sentence.

Appeal from Shawnee District Court; CHERYL RIOS KINGFISHER, judge. Opinion filed January 16, 2015. Conviction affirmed, sentence vacated, and case remanded with directions.

*Christina M. Kerls*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jodi E. Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: A jury found Trevejon Killings guilty of premeditated first-degree murder, and he received a sentence of life in prison without the possibility of parole for 50 years (hard 50 life sentence).

On direct appeal before this court, Killings argues: (1) The district court erred by failing to instruct the jury on second-degree intentional murder and second-degree reckless murder as lesser included offenses of premeditated first-degree murder; (2) the prosecutor committed misconduct during his closing arguments; (3) the district court erred by answering a juror's question when Killings was not present; (4) the cumulative

5

effect of these alleged trial errors denied him a fair trial; (5) the district court, for multiple reasons, erred when it imposed a hard 50 life sentence; and (6) the district court erred by imposing lifetime postrelease supervision instead of lifetime parole.

We conclude that the district court applied the wrong legal standard when it denied Killings' request for a jury instruction on second-degree intentional murder. But, we find that this error was harmless considering the overwhelming amount of evidence establishing that the victim's death resulted from a premeditated killing. We also conclude that the prosecutor's comment during closing argument stating that Killings failed to take responsibility for the murder was improper, but we find that the comment did not constitute reversible error. The other alleged trial errors raised in this appeal have no merit and, thus, we affirm Killings' premeditated first-degree murder conviction.

Killings also challenges the constitutionality of his hard 50 life sentence, which was imposed under K.S.A. 21-4635, as violating his right to a jury trial as guaranteed by the Sixth Amendment to the United States Constitution. We vacate the hard 50 life sentence as required by *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2155, 2160-63, 186 L. Ed. 2d 314 (2013), and *State v. Soto*, 299 Kan. 102, 124, 322 P.3d 334 (2014) (K.S.A. 21-4635 violates Sixth Amendment because it permits judge to find by preponderance of the evidence existence of aggravating factor necessary to impose increased mandatory minimum sentence, rather than requiring a jury to make that finding beyond a reasonable doubt). We remand the case to the district court for resentencing.

FACTS

During the evening of January 21, 2010, Antonio Jackson (a/k/a/ "Ghost") was shot and killed inside Bobbie McCray's apartment in Topeka. Prior to the murder, McCray was hosting a get-together at her apartment where Jackson, McCray, and three

others were consuming crack cocaine in McCray's bedroom. While this was going on, Deborah Metcalf, Brenda Moore, and Moore's 2-year-old son remained in the front of the apartment where the living room and kitchen were located.

After consuming his allotment of crack, Jackson asked the group whether they knew where he could barter marijuana (which he had) for more crack. McCray said she could make the trade for Jackson, so she took Jackson's marijuana, left the apartment, and walked the short distance north up the alley to Killings' home.

When McCray arrived at the residence, Killings let her inside and agreed to exchange some crack cocaine for the marijuana she had. After making the trade, Killings asked McCray who was at her apartment. McCray named each individual there, including Jackson. Notably, Jackson and another individual with the street name of "R.P." had robbed Killings inside his home on December 22, 2009. After hearing that Jackson was at McCray's apartment, Killings asked McCray if he could accompany her back to her apartment. McCray agreed, and the two of them left Killings' home and walked back to her apartment.

On their way to the apartment, a Topeka police vehicle drove up the alley towards them. Corporal Chris Sturgeon was riding in the vehicle and saw McCray (whom he recognized from previous encounters) and a black male walking with her. As the vehicle slowly passed by them and continued down the alley, Sturgeon said, "Hi" or "Hey, Bobbie" to McCray. Sturgeon later identified Killings as the man he saw walking with McCray that night.

McCray and Killings eventually arrived at the apartment. McCray entered first, followed by Killings. Metcalf and Moore, who were still in the front area of the apartment, saw Killings, whom they both recognized, enter the apartment. Metcalf asked

7

Killings "[W]hat's up?" or "[W]hat you doing here?" and Killings responded by placing a finger up to his mouth, signaling for Metcalf and Moore to be quiet. Killings proceeded to follow McCray down the hallway toward her bedroom.

Once Killings entered the bedroom, he pulled out a handgun, aimed it at Jackson, taunted him (saying "[R]emember me[,] nigger?" "[Y]ou robbed me[,] nigger," or "[M]otherfucker do you remember me?"), and fired his gun four times at Jackson. When the shooting began, Jackson lunged toward Killings, trying to get the gun away from him or to simply avoid being shot. Jackson sustained a single gunshot wound and died at the scene.

During the shooting, Renee Stewart, one of the individuals inside the bedroom, ran out of the room, passing Killings. Killings and Stewart both ran toward the front door of the apartment, and the two got tangled up on the way out the door. Killings tripped over Stewart and then knocked her down outside the apartment. While on the ground, Stewart heard what she described as an ammunition magazine hit the ground beside her head. Stewart saw Killings run out the back gate of the apartment complex and into the alley.

Stewart eventually got up and went downstairs to the apartment directly below McCray's apartment. Moore, taking her son, also went to this apartment. The residents of the apartment called 911 to report the shooting, and, within minutes, law enforcement arrived at the apartment complex.

McCray and Metcalf sat on the steps outside McCray's apartment until law enforcement arrived. As McCray and Metcalf were sitting there, they noticed an ammunition magazine lying on the ground nearby. They pointed out the magazine to law enforcement once the officers arrived, and the magazine was seized and taken into custody. Subsequent testing of the magazine revealed the presence of Killings' DNA.

8

McCray and Metcalf were taken to the law enforcement center and interviewed that night. Initially, McCray told detectives that she did not see who the shooter was because, as she explained later at trial, she did not want to get Killings in trouble. Later that same night, however, McCray identified Killings in a photo lineup as the shooter.

The detectives also interviewed Metcalf. She wrote a brief statement indicating that she was in the kitchen when the "suspect" came into the bedroom, shot three to four times, and left the apartment. After telling the detectives she knew where the shooter lived, Metcalf went with law enforcement and showed them the house. The officers then called dispatch and asked it to look up any calls that had previously occurred at Killings' address. The officers learned that there had been a prior robbery call at that address in December 2009. Killings was listed as the victim and "Ghost" (a/k/a/ Jackson) was listed as the perpetrator of the robbery.

After Metcalf identified the shooter's home, she was taken to the law enforcement center and shown three photo lineups. The third lineup contained a photograph of Killings, and Metcalf identified Killings as the person who shot Jackson. Detectives later interviewed Stewart, Moore, and Arlene Love, one of the individuals who was inside the bedroom during the shooting. Stewart and Love were shown photo lineups and picked Killings' photo as identifying the shooter. Moore was shown a photo lineup containing Killings' photo but did not pick any photo as identifying the shooter.

Pursuant to a search warrant, law enforcement officers searched Killings' home and found a single unfired Winchester .40 caliber Smith and Wesson bullet on the floor of the home. This bullet matched the type of ammunition found in the magazine discovered outside of McCray's apartment. The bullet also matched three .40 caliber shell casings that the officers found inside McCray's apartment.

9

Killings turned himself in to law enforcement on January 23, 2010. After being advised of his rights, Killings provided a statement regarding his whereabouts during the evening hours of January 21, 2010. Killings claimed that during the time of the shooting, he and his girlfriend were at Westridge Mall in Topeka where he purchased some clothes at a Footlocker store. After spending about 2 hours at the mall, the couple then headed for Lawrence, arriving there at approximately 7:30 p.m. Killings said that they tried to get into a casino in Lawrence, but he forgot to bring his ID. He then said that they returned to Topeka at approximately 9 p.m. and he spent the night at "Warren House" in Topeka. Killings specifically denied ever going over to McCray's apartment on January 21.

On January 27, the detectives who conducted the Killings interview spoke to the manager of Footlocker who was working at the store during the evening hours of January 21. The detectives showed the manager photos of Killings and his girlfriend and asked whether they came into the store on January 21. The manager said he did not believe they came into the store. When asked about a video surveillance system, the manger told the detectives that the store did not have one. According to the detectives, the mall had no video surveillance system in place.

The detectives also spoke with members of the Lawrence Police Department and asked whether there was a casino or an establishment referred to as a casino in Lawrence. The officers told the detectives that they were not familiar with anything like a casino in Lawrence.

Ultimately, Killings was charged with one count of premeditated first-degree murder. The case proceeded to a jury trial where McCray, Metcalf, Moore, Stewart, and Love all testified and identified Killings as the man who shot Jackson. Bertram Grant, another individual inside the bedroom, testified that he did not get a good look at the

10

shooter but heard him ask, "'[M]otherfucker, do you remember me?'" prior to shooting Jackson. The jury convicted Killings of first-degree murder. The district court imposed a life sentence with no possibility of parole for 50 years and ordered lifetime postrelease supervision. Killings filed a timely notice of appeal.

More facts will be stated as they become pertinent to the issues discussed below.

LESSER INCLUDED OFFENSE INSTRUCTIONS

Killings argues that the district court erred when it denied his request that the jury be instructed on both second-degree intentional murder and second-degree reckless murder. In reviewing these alleged instructional errors, this court conducts a four-step analysis. Those steps, with accompanying standards of review, are:

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

A. *Second-Degree Intentional Murder*

The State concedes that Killings preserved this instructional issue for appeal by requesting a second-degree intentional murder instruction at the jury instruction conference.

11

Second-degree intentional murder is a lesser included offense of premeditated first-degree murder because the only difference between the two crimes is the element of premeditation. See K.S.A. 21-3401(a) (first-degree premeditated murder is the killing of a human being committed intentionally and with premeditation); K.S.A. 21-3402(a) (second-degree intentional murder is the killing of a human being committed intentionally); *State v. Warledo*, 286 Kan. 927, 951, 190 P.3d 937 (2008) ("[S]econd-degree intentional murder is a lesser included offense of first-degree premeditated murder because all the elements of second-degree murder are identical to some of the elements of first-degree murder" [citing K.S.A. 21-3107(2)(b)].). Accordingly, an instruction on second-degree intentional murder would have been legally appropriate.

With regard to whether an instruction for second-degree intentional murder would have been factually appropriate, K.S.A. 22-3414(3) states that "[i]n cases where there is some evidence which would reasonably justify a conviction of some lesser included crimes . . . , the judge shall instruct the jury as to the crime charged and any such lesser included crime." Killings points out that the district court, in ruling that the evidence presented at trial did not support giving a lesser included offense instruction on second-degree intentional murder, stated: "The jury could find this was an intentional premeditated act  . . . ." We agree with Killings' argument that the district court verbalized the wrong legal standard. But we conclude that this error was harmless.

Even if we assume that the evidence presented at trial made a second-degree intentional murder instruction factually appropriate under K.S.A. 22-3414(3), we conclude that there is no reasonable possibility that the jury, had it been instructed on the lesser included offense, would have found Killings guilty of second-degree intentional murder instead of premeditated first-degree murder because of the overwhelming evidence presented on premeditation. See *State v. Ward*, 292 Kan. 541, 565, 256 P.3d

12

801 (2011) (If an error implicates a constitutional right, then "a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict."), *cert. denied* 132 S. Ct. 1594 (2012); see also *State v. Brown*, 298 Kan. 1040, 1051, 318 P.3d 1005 (2014) (if constitutional harmless error standard is met, then lower statutory standard under K.S.A. 60-261 is also satisfied).

Again, the only difference between premeditated first-degree murder and second-degree intentional murder is the element of premeditation. This court has explained premeditation as follows:

"[P]remeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation. [Citations omitted.] Further, it is not necessary that there be direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable. [Citation omitted.] In other words, '[i]ntent . . . may be shown by circumstantial evidence, and a person is presumed to intend all the natural consequences of his acts.' [Citation omitted.]

"In considering circumstantial evidence, Kansas caselaw identifies factors to consider in determining whether the evidence gives rise to an inference of premeditation that include: '(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.' [Citations omitted.] But the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. [Citations omitted.] Use of a deadly weapon by itself, however, is insufficient to establish premeditation. [Citation omitted.]" *State v. Williams*, 299 Kan. 509, 525-26, 324 P.3d 1078 (2014).

13

Killings' jury was instructed on the concept of premeditation:

"'Premeditation' means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

There was abundant evidence presented at trial which established that Killings' act of killing Jackson was premeditated and, thus, constituted a first-degree murder. After Killings learned from McCray that Jackson—the man who had previously robbed him—was at her apartment, Killings expressed an interest in going to McCray's apartment. Armed with a gun, Killings walked with McCray back to her apartment. When he followed McCray into the apartment, Killings signaled to Metcalf and Moore to remain quiet and followed McCray to the bedroom. Upon entering the bedroom, Killings pulled out his gun, pointed it at Jackson, and taunted him. He then fired his gun multiple times at Jackson, hitting him once.

It can be clearly inferred from this evidence that once Killings realized he had an opportunity to exact revenge upon Jackson, he seized upon that opportunity. Prior to firing his gun at close range at Jackson, Killings had a significant amount of time to deliberate upon his chosen course of action while he walked from his house to McCray's apartment carrying a loaded gun. This evidence, along with the unprovoked nature of the shooting and the taunt Killings directed at Jackson prior to firing his weapon at him, all indicate the premeditated nature of Jackson's murder.

In support of his argument that there was a reasonable possibility the jury could have convicted him of second-degree intentional murder had it received an instruction on

14

that crime, Killings points to Love's testimony in which she stated that when Jackson saw Killings, Jackson lunged at him. Killings argues that the jury could have inferred from Love's testimony that he only shot Jackson once he perceived that Jackson was going to attack him.

As the State points out in its brief, the problem with this argument is that Love did not testify that Jackson lunged at Killings before Killings had his gun out. Love stated that Jackson lunged at Killings after Killings began firing his weapon. Love speculated that Jackson lunged at Killings in order to avoid getting shot or to make an attempt at getting the gun away from Killings. Accordingly, Love's testimony did not establish that Jackson lunged at Killings and Killings shot him in response. Instead, Love's testimony corroborated the other witnesses' testimonies establishing that Killings, unprovoked on that particular evening, shot Jackson.

Based on the evidence recounted above, we conclude that any error based on the district court's failure to instruct on second-degree intentional murder constituted harmless error.

B. *Second-Degree Reckless Murder*

The State again concedes that Killings preserved this instructional issue for appeal by requesting an instruction on second-degree reckless murder at the jury instruction conference.

Second-degree reckless murder is the killing of a human being committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life. K.S.A. 21-3402(b). The act is a lesser included offense of premeditated first-degree murder. See *State v. Martinez*, 288 Kan. 443, 453, 204 P.3d 601

15

(2009) ("Reckless second-degree murder is a lesser included offense of premeditated first-degree murder."). Accordingly, an instruction on second-degree reckless murder would have been legally appropriate.

With regard to whether such an instruction would have been factually appropriate, this court stated in *State v. Deal*, 293 Kan. 872, 884, 269 P.3d 1282 (2012), that second-degree reckless murder is a killing of a human that is not purposeful, willful, or knowing but which results from an act performed with knowledge that the victim is in imminent danger, although death is not foreseen. Killings argues that an instruction on second-degree reckless murder was factually appropriate given Stewart's testimony at trial that she did not think Killings meant to kill Jackson.

During her direct examination, Stewart was asked why she did not initially identify Killings as the shooter when she spoke to detectives. Stewart answered: "For one, to me [Killings] was in his feelings why he did it. I don't think that he meant to kill [Jackson], but still it happened so, and [Jackson] wasn't a bad person . . . ." The prosecutor later asked Stewart to explain this statement:

> "Q. Now, you said something a minute ago that I want to talk about a little bit. You said you don't believe [Killings] meant to do it?
> "A. Yeah.
> "Q. That he was into his feelings?
> "A. Uh-huh.
> "Q. What does that mean?
> "A. That means it was revenge."

Stewart went on to explain that Killings murdered Jackson in order to get revenge for Jackson and another individual robbing him.

16

Later, on cross-examination, Stewart was again asked what she meant when she said Killings did not mean to kill Jackson:

> "Q. And when you say that Killings didn't mean to kill [Jackson], what you mean was he meant to punish him for what happened, but he didn't mean to kill him, is that what you meant?
> "A. I just don't think he meant to do it."

The State contends that Stewart's opinion as to whether Killings intended to kill Jackson was, at most, pure speculation. The State argues that Stewart had no personal knowledge of Killings' intent and there was no other evidence presented at trial that corroborated Stewart's opinion of Killings' intent.

Reviewing the entirety of Stewart's comments, it is clear that what Stewart was trying to convey by saying she did not think Killings meant to kill Jackson was that, but for Killings being upset at Jackson for robbing him, Killings would not have killed Jackson. Thus, her statement cannot be relied on as providing factual support for a second-degree reckless murder instruction. But even if we ignore Stewart's later explanation for her statement and assume that she literally thought Killings did not mean to kill Jackson, her statement would be speculative at best and completely unsupported by the evidence establishing that Jackson's death resulted from a premeditated, intentional killing. Accordingly, her statement does not provide factual support for a second-degree reckless murder instruction. *Cf. State v. Calderon*, 270 Kan. 241, 255-56, 13 P.3d 871 (2000) (in light of overwhelming evidence of intent, no evidence of recklessness, and despite defendant's "self-serving statement" to police that he meant to cut victim on the arm instead of stabbing him in the abdomen, court held district court did not err in failing to instruct on reckless second-degree murder and reckless involuntary manslaughter).

17

Again, the evidence presented at trial established that Killings went to McCray's apartment with the intent to exact revenge upon Jackson for the prior robbery. Once he was inside the apartment and made his way to the doorway of McCray's bedroom, he pointed a gun at Jackson, taunted him, and shot at him multiple times, hitting him once. The only inference that can be gleaned from this evidence is that Killings intended to kill Jackson. Accordingly, an instruction on second-degree reckless murder would have been factually inappropriate. *Cf. State v. Cordray*, 277 Kan. 43, 56, 82 P.3d 503 (2004) (evidence sufficient to support jury verdict of unintentional but reckless second-degree murder where the defendant fired a gun in the general direction of a vehicle at night, striking an occupant); *State v. Jones*, 27 Kan. App. 2d 910, 915, 8 P.3d 1282 (2000) (held jury could have found evidence supporting recklessness where witnesses testified defendant shot gun randomly over crowd of people with eyes closed).

Based on the evidence presented at trial, we conclude that the district court did not err by denying Killings' request to instruct the jury on second-degree reckless murder.

PROSECUTORIAL MISCONDUCT

Killings raises several instances of alleged prosecutorial misconduct during closing arguments. He claims that the prosecutor improperly commented on: (1) Killings' exercise of his constitutional right to a jury trial; (2) Killings' failure to present any evidence at trial; and (3) the credibility of several witnesses. Each of these alleged examples of misconduct will be addressed in turn.

Appellate review of a prosecutorial misconduct claim based on improper comments requires a two-step analysis. First, an appellate court decides whether the comments at issue were outside the wide latitude a prosecutor is allowed when discussing evidence. If so, there was misconduct. Second, if misconduct is found, an appellate court

18

determines whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013).

Prosecutors enjoy wide latitude in crafting closing arguments. See *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516 (citing *State v. Miller*, 268 Kan. 517, Syl. ¶ 4, 997 P.2d 90 [2000]), *cert. denied* 534 U.S. 1047 (2001). This latitude allows a prosecutor to make reasonable inferences based on the evidence, but it does not extend so far as to permit arguing facts not in evidence. *State v. Tahah*, 293 Kan. 267, 277, 262 P.3d 1045 (2011). For instance, "[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law." *State v. Baker*, 281 Kan. 997, 1016, 135 P.3d 1098 (2006). Arguments must remain consistent with the evidence. If they are not, the first prong of the prosecutorial misconduct test is met, and an appellate court must then consider whether the misstatement prejudiced the jury against the defendant and denied the defendant a fair trial. *Bridges*, 297 Kan. at 1014.

A. *Were the Statements Improper?*

1. *Commenting on Killings' Right to a Jury Trial*

The following exchange took place during the prosecutor's closing arguments:

"You heard from, I believe everyone that was there, everyone that has information about the circumstances surrounding the murder of Mr. Jackson.

"The evidence is overwhelming that the defendant murdered Mr. Jackson on January 21, 2010. So why are we here with this kind of evidence, this kind of physical evidence and testimonial evidence, why are we here?

"*We are here because the defendant was given an opportunity, he failed to accept responsibility for his homicidal act; and now that responsibility is passed along to you.*

*Your responsibility now is to hold him accountable for something of which he would not accept responsibility for.*

      "[DEFENSE COUNSEL]: Your Honor, I object to any acceptance of responsibility. That's not what we are here for. I think it is improper.

      "THE COURT: Okay. Counsel, go ahead and move on.

      "[THE PROSECUTOR]: You have the task at this point to hold the defendant accountable for his acts, and what can you consider in doing that? You can only consider the evidence that was presented over the last week and a half. What is that evidence? Well, it is the testimony of many witnesses. It is the admission of many exhibits, all of which, which shed light on the circumstances surrounding the homicide of Mr. Jackson." (Emphasis added.)

Killings contends that the prosecutor's comment regarding his refusal to accept responsibility "cast negative aspersions" on him for exercising his constitutional right to a jury trial. Killings likens the prosecutor's comment to impermissible comments regarding a defendant's postarrest silence. See *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). A *Doyle* violation occurs when the government attempts to impeach a defendant's version of events offered at trial on the basis that the defendant remained silent after being advised of his or her *Miranda* rights and, thus, did not offer the information at an earlier point in the criminal investigation. 426 U.S. at 617-19; see *State v. Kemble*, 291 Kan. 109, 121-23, 238 P.3d 251 (2010).

Killings' comparison of the prosecutor's statement here to a *Doyle* violation is unnecessary. There is already precedent in Kansas prohibiting a prosecutor from making disparaging comments about a defendant exercising his or her right to a jury trial. See *State v. Snow*, 282 Kan. 323, 336-39, 144 P.3d 729 (2006), *disapproved on other grounds by State v. Guder*, 293 Kan. 763, 267 P.3d 751 (2012); *State v. Tosh*, 278 Kan. 83, 91-92, 91 P.3d 1204 (2004). Furthermore, unlike a defendant in a *Doyle* case, who exercises his or her right to remain silent during a post-*Miranda* warnings interrogation but later testifies at trial and provides an exculpatory version of events, Killings voluntarily

20

provided police with an explanation of his whereabouts during the time of the shooting. Later, however, he chose not to testify at trial. Accordingly, the facts of this case make it distinguishable from the typical *Doyle*-violation case.

Killings makes the additional argument that the prosecutor's statement here is similar to the statement found to be improper in *Tosh*. In *Tosh*, the prosecutor asked the jury to think about why the defendant was "bothering to do this" (*i.e.*, go through with a jury trial) when he had already confessed to committing the charged crimes. This court determined that the prosecutor's comment improperly injected a matter outside the evidence into the jury's deliberations and concluded that the comment was outside the wide latitude given to prosecutors. 278 Kan. at 91-92.

Similarly, in *Snow* the defendant complained on appeal that the prosecutor denied him a fair trial by disparaging him for exercising his constitutional right to a jury trial. As recounted in *Snow*:

> The prosecutor began her closing arguments by stating:

> > "'[M]embers of the jury, there may be some of you who are sitting there thinking, why have we given two days to listen to this evidence? And the answer is simply this: Everyone who's charged with a crime in this country has an absolute right to a jury trial if that's what they demand. The defendant has indicated he wants a jury trial, and now he's had it. Despite the amount of evidence that might be there against them, if he wants it, I have to put it on, and we've done that.'" 282 Kan. at 337.

> The prosecutor closed her arguments stating:

> > "'Now, the defendant wants his jury trial, he's had his jury trial, and it[']s time to put an end to this nonsense.'" 282 Kan. at 337.

21

The *Snow* court ultimately concluded that "the prosecutor's comments . . . injected a matter outside the evidence, inferring that Snow should have acceded to the State's evidence and waived his right to a fair trial because of the strength of the State's evidence against him." 282 Kan. at 338; see also *State v. Nye*, 46 Kan. App. 2d 182, 194-95, 261 P.3d 923 (2011) (finding prosecutor's statements that defendant knew when he refused to take breath test and during trial that he was guilty of DUI were improper because they "impugned [the defendant's] right to contest the DUI charge and request a jury trial"), *rev. denied* 293 Kan. 1112 (2012).

Like the statements at issue in *Snow* and *Tosh*, the statement here injected a matter outside the evidence presented at trial by asking the jury, "'Why are we here?'" *i.e.*, going through with a jury trial when the evidence of Killings' guilt was so overwhelming. The prosecutor then answered his own rhetorical question by suggesting that he and the jury were enduring the burden of a jury trial because Killings "'failed to take responsibility for his homicidal act.'" By making this argument, the prosecutor was clearly suggesting to the jury that Killings should have acceded to the State's evidence and waived his right to a jury trial because of the strength of the State's evidence against him. Accordingly, we find this statement outside the bounds of permissible argument.

Because Killings complains of other statements made by the prosecutor during closing arguments, we will analyze those statements before determining whether the prosecutor committed reversible misconduct during closing arguments.

## 2. *Commenting on Killings' Failure to Present Evidence*

Next, Killings objects to a statement the prosecutor made near the beginning of his rebuttal arguments. To place the prosecutor's comments in context, it is necessary to first examine the arguments that defense counsel made during his closing arguments.

Because the defense did not present any evidence at trial, defense counsel's closing arguments consisted of pointing out supposed weaknesses in the State's case identifying Killings as Jackson's murderer. In making these arguments, defense counsel identified pieces of evidence that the State could have procured but did not present at trial:

- The photo that the detective showed to the manager at Footlocker to determine whether Killings was at the store at the time of the shooting.

- Testing which would have identified the biological material (*e.g.*, blood) on the magazine clip containing Killings' DNA.

- Comparisons of the DNA found on the magazine clip to the DNA of other people who were at McCray's apartment on January 21.

- Testimony from "R.P.," Jackson's alleged accomplice in the robbery of Killings.

- The cell phone records for everyone who was at McCray's apartment on January 21.

- Killings' prior convictions to establish that he had a history of engaging in violence (the district court sustained the State's objection to this argument).

23

Throughout his closing arguments, defense counsel suggested that the State did not present this evidence at trial because the evidence did not fit within its theory of the case, *i.e.*, that Killings murdered Jackson in order to exact revenge for the prior robbery. Because this evidence was not presented at trial, defense counsel argued that the State had not carried its burden of proof.

Near the beginning of the State's rebuttal arguments, the prosecutor stated:

"[Defense Counsel] wants you to pay attention to the things that weren't presented, and that's somehow if it wasn't presented it's because the State didn't want you to know about it, because it doesn't fit the theory of the case.

"Ladies and gentlemen, I don't know how many pieces of evidence that were admitted and it is not the amount of items that really ultimately matters; but I will tell you this, *every item that was admitted was presented to you by the State. Every witness that testified that relayed their information to you was presented by the State.* I tell you that because the State is not hiding anything. We put on everything we had. Everything that was available." (Emphasis added.)

The prosecutor proceeded to explain why certain pieces of evidence were not presented and disputed defense counsel's suggestion that, without this evidence, the State had not carried its burden of proof.

Killings contends that the italicized portion of the prosecutor's rebuttal argument above was improper because it implied that the defense had an obligation to present evidence at trial and failed to do so. In other words, the prosecutor attempted to shift the burden of proof to the defense.

"Kansas courts deem it 'improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof.'

24

[Citations omitted.] But we grant prosecutors considerable latitude to address the weaknesses of the defense. [Citations omitted.]" *State v. Duong*, 292 Kan. 824, 832, 257 P.3d 309 (2011); see *State v. McKinney*, 272 Kan. 331, 346, 33 P.3d 234 (2001) (where jury has been properly instructed that prosecution has burden of proof, a prosecutor may argue inferences based on the balance or lack of evidence), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). Though this court has made clear recently that "a prosecutor commits misconduct by making an improper argument, even if the improper argument is made in response to arguments or statements by defense counsel," *State v. Marshall*, 294 Kan. 850, 860, 281 P.3d 1112 (2012), the prosecutor's comment must still be evaluated in the context of which it was made. See *State v. Williams*, 299 Kan. 911, 937-41, 329 P.3d 400 (2014).

"When a prosecutor's comment 'constitute[s] only a general question about the absence of evidence to rebut the State's witnesses . . . [and] not an impermissible remark about the defendant's failure to testify or an attempt to shift the burden of proof to the defense,' the comment is within the wide latitude afforded to the prosecution. [Citations omitted.]" *State v. Peppers*, 294 Kan. 377, 397-98, 276 P.3d 148 (2012).

Applicable here, this court has held that a prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case. See, *e.g.*, *Williams*, 299 Kan. at 939 ("[I]f a defendant asks the jury to draw an inference that the State's evidence is not credible because the State did not call a witness to corroborate other evidence, we have held that the State can refute the inference by informing the jury that the defense has the power to subpoena witnesses, including those who would be favorable to the defense."); *State v. Wilson*, 295 Kan. 605, 623-25, 289 P.3d 1082 (2012) (holding prosecutor's arguments that defendant had no explanation for his DNA found near crime scene did not improperly shift burden of proof; rather, it was comment on efficacy of defense and pointed jurors to lack of evidence supporting defendant's version of events); *State v.*

25

*Cosby*, 293 Kan. 121, 135-37, 262 P.3d 285 (2011) (finding prosecutor's statements asking jury if it had heard any evidence that suggested witness' testimony was wrong did not improperly shift burden of proof because prosecutor was only commenting generally on defendant's failure to rebut witness' testimony and not commenting on defendant's failure to testify); *Duong*, 292 Kan. at 832-33 (holding prosecutor's arguments questioning defendant's failure to present evidence of misidentification did not improperly shift burden of proof because prosecutor did not call upon defense to disprove crime's occurrence but rather pointed out that evidence supporting defense theory was thin); *State v. Stone*, 291 Kan. 13, 18, 237 P.3d 1229 (2010) (finding prosecutor's statements that defendant had "'obstacles to overcome'" were within considerable latitude granted to prosecutors to comment on weaknesses of defenses).

Contrary to Killings' arguments, the prosecutor did not suggest or infer that Killings had the burden to show that he was not involved in Jackson's murder. Rather, the prosecutor, by merely noting that the State had presented all the evidence admitted at trial, was responding to defense counsel's argument that the State chose not to present certain pieces of evidence that did not fit within its theory of the case. As the cases cited above show, it would have been permissible for the prosecutor to go one step beyond his statement and explicitly note in rebuttal that the defense had the ability to present the missing evidence it identified as damaging to the State's case. Accordingly, the prosecutor's comments were not outside the wide latitude allowed in discussing evidence.

3. *Commenting on the Credibility of Witnesses*

Lastly, Killings points to four instances during the prosecutor's closing and rebuttal arguments which he argues constitute improper comments on the credibility of witnesses.

26

During the prosecutor's closing arguments, he discussed the testimonies of the people inside McCray's apartment when the shooting occurred:

"These people are not about the system, but they did their job. Did they run to the police and tell them what happened, no. They had to be found, except for Bobbie and Deborah stayed around where they are. They came down to the police station. They all gave their story, and when it first started they didn't say who did it. They didn't want to be involved in the homicide to begin with. They don't want to be involved in fingering anyone because they know they have to come to court and testify, but when push came to shove they told law enforcement who did it, and then they came in this courtroom and told all of you who did it, and *I made each one of them point at the defendant and identify him. Because that's not easy to do, especially if that's not the person.* They were cross examined by [defense counsel] thoroughly, hammered at times, rightfully so. The defendant has that right, but they never wavered, ladies and gentlemen. They told you what happened on the 21st day of January, 2010." (Emphasis added.)

Defense counsel suggested during his closing arguments that the testimony of the witnesses inside McCray's apartment during the shooting, identifying Killings as the shooter, could not be trusted due to most of them admitting to consuming crack cocaine just before the shooting. He also suggested that these witnesses may have spoken to each other before speaking individually to law enforcement in order to concoct a story identifying Killings as the shooter. Though there was no evidence admitted at trial to support his allegations, defense counsel suggested that R.P., Jackson's alleged accomplice in the robbery of Killings, was the murderer and that the witnesses inside the apartment were protecting R.P. because he was their crack dealer.

The prosecutor responded to these arguments during his rebuttal arguments by making the following statements:

- "Now, to pull off this conspiracy [*i.e.*, frame Killings for Jackson's murder,] as I indicated earlier, it is quite elaborate and quite involved, and it requires scientific expertise, the transference of DNA, knowing how to do that, and where to get it. It just boggles the mind to even imagine how Bobbie and Deborah and Renee and Bernard and Arlene and Ms. Moore could put this altogether and keep it together. *If it's made up, if it's fabricated it is going to fall apart at some point. These people are not going to keep it together over time, and yet if they have. Why? Because that's what happened, it's easy to keep it together when all you are repeating and all you are telling is what you saw, what you heard and what you did. It is much harder when you fabricate things.*" (Emphasis added.)

- "I've heard no evidence and maybe you have, where RP was the [crack] dealer. I believe in saying that [defense counsel is] suggesting maybe RP was the murderer and all these witnesses are framing his client in order to protect RP.

    "Now, the only evidence I've heard regarding the crack dealer is the defendant. That's where at least Bobbie McCray was going to buy her crack, in fact, traded for crack; and I think [defense counsel] is right. *I think crack addicts wrongly so want to protect their dealer because that's the source of their supply, to feed their addiction; but ladies and gentlemen, even crackheads draw a line in the sand and he's dead. When push came to shove they realized what went down inside that apartment as much as they didn't want to be involved and as much as they initially did not want to cooperate with the law enforcement. I think in the end they even realized this crossed the line. Yes we are crack addicts. Yes, we've done things in the past we regret, but we are not murderers and they can't condone that. So I think in the end they realize and went above and beyond what is acceptable even with their lifestyle, and that's why they came in here and told you what they told you. Not because they are setting up Mr. Killings for a fall, because again they have really no interest in dealing with law enforcement or the courts because of what they do. They want to avoid that. But even they have a conscience.*" (Emphasis added.)

28

- "[I] talked in detail about Ms. McCray, Ms. Metcalf, Ms. Stewart, a lot of the individuals, and *there's one that I mentioned earlier which kinda stands out to me. I don't know why. I guess maybe it is the way she presented herself on the stand, and during her interview, Arlene Love. Now think for yourself as far as you want to pick apart, which you'll do. Arlene Love is a person that will have, if somebody told her to do something she didn't want to do or didn't believe, Arlene Love ain't doing it. She is a strong woman, admitted crack addict, a strong woman. She is not going to take the fall for anyone else. She is not going to fall into conspiracy of other people if it did happen, because she doesn't want the police up in her business. She does her thing, handles her business and moves along. You saw her. She never wavered from the time of the interview to the time she took the stand. She is a strong woman.*" (Emphasis added.)

Killings argues that the italicized portions of the above statements constitute impermissible comments on the credibility of witnesses.

It is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, including the defendant. See *State v. Elnicki*, 279 Kan. 47, 59-64, 105 P.3d 1222 (2005); *State v. Davis*, 275 Kan. 107, 121-23, 61 P.3d 701 (2003); *State v. Pabst*, 268 Kan. 501, 506-07, 996 P.2d 321 (2000). A prosecutor, however, "may explain the legitimate factors which a jury may consider in assessing witness credibility and may argue why the factors present in the current case should lead to a compelling inference of truthfulness." *State v. Scaife*, 286 Kan. 614, Syl. ¶ 5, 186 P.3d 755 (2008); see, *e.g.*, *State v. Huerta-Alvarez*, 291 Kan. 247, 262, 243 P.3d 326 (2010) (finding that prosecutor's remarks in closing regarding victim's credibility "were generally in the nature of reviewing what [the victim] said, asking the jury to assess the credibility of her statements, and querying the jury why she would not have made up a more convenient story if in fact she had fabricated the story at all").

In commenting on the credibility of the witnesses to the shooting, the prosecutor never offered a personal opinion as to whether the witnesses were credible (*e.g.*, I believe

Bobbie McCray is credible). Instead, the comments quoted above show that the prosecutor directed the jury to the evidence and factors he argued established the credibility of the witnesses. Thus, we conclude that the statements were not outside the wide latitude allowed to a prosecutor in discussing the evidence presented at trial.

B. *Did the Prosecutor Commit Reversible Misconduct?*

As determined above, we deem one comment to be improper—the prosecutor's comment regarding Killings' decision not to accept responsibility and instead exercise his right to a jury trial. We now move on to the second prong of the prosecutorial misconduct analysis. This involves a three-factor inquiry:  (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. No one factor is controlling. *State v. Crawford*, 300 Kan. 752, Syl. ¶ 3, 334 P.3d 311 (2014); *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013); *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004). Before the third factor can ever override the first two factors, an appellate court must be able to say that the State can meet both the statutory harmlessness standard stated in K.S.A. 60-261 and the constitutional standard stated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Crawford*, 300 Kan. 752, Syl. ¶ 4; *Bridges*, 297 Kan. at 1012 (citing *Tosh*, 278 Kan. at 97); see *State v. Ward*, 292 Kan. 541, Syl. ¶¶ 5-6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

We have observed that, as a practical matter, the result of the harmless error evaluation depends on the outcome of the *Chapman* constitutional standard. "[B]oth the constitutional and nonconstitutional error clearly arise from the very same acts and omissions," and the constitutional standard is more rigorous. *Bridges*, 297 Kan. at 1015 (citing *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 [2013]). Thus, the State

30

necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard. 296 Kan. at 1111.

With regard to the first factor—whether the misconduct was gross and flagrant—we consider whether the misconduct was repeated, was emphasized, violated a long-standing rule, violated a clear and unequivocal rule, or violated a rule designed to protect a constitutional right. *Marshall*, 294 Kan. 850, Syl. ¶ 6. Here, the prosecutor only referred one time to Killings' decision to exercise his constitutional right to a jury trial (*i.e.*, "[W]hy are we here?"). Though we have held that it is improper for a prosecutor during closing arguments to impugn a defendant for choosing to exercise his or her right to a jury trial, see *State v. Snow*, 282 Kan. 323, 338, 144 P.3d 729 (2006), *disapproved on other grounds by State v. Gruder*, 293 Kan. 763, 267 P.3d 751 (2012); *Tosh*, 278 Kan. at 91-92, we have also held that it is proper for a prosecutor to argue that, based on the evidence, the defendant, by providing an implausible alibi, was not taking responsibility for the defendant's actions and that the jury should hold the defendant accountable. See *State v. Finley*, 273 Kan. 237, 244-45, 42 P.3d 723 (2002). A review of the prosecutor's statement shows that the bulk of the statement consisted of arguments that are proper under *Finley*. Accordingly, we find that the prosecutor's lone reference to Killings' decision to proceed with a jury trial was not gross and flagrant.

In analyzing whether a prosecutor's misconduct was motivated by ill will, we consider whether the misconduct was deliberate, repeated, or in apparent indifference to a court's ruling." *Marshall*, 294 Kan. 850, Syl. ¶ 7. Again, the prosecutor made a single reference to Killings' decision to proceed with a jury trial. The bulk of his statement, however, was proper under *Finley*. When defense counsel lodged an objection, counsel complained of the prosecutor's argument suggesting that Killings failed to accept responsibility. The district court did not make an explicit ruling on the objection but directed the prosecutor to "go ahead and move on." The prosecutor proceeded to argue

31

that the jury, based on the evidence, should hold the defendant accountable—again, a proper argument under *Finley*. Accordingly, we conclude that there was no evidence of ill will on the part of the prosecutor.

Finally, we turn to the third factor: Was the evidence of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors? In answering this question, the State, as the party "benefitting from the prosecutorial misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights, *i.e.*, there is no reasonable possibility the error affected the verdict." *State v. Inkelaar*, 293 Kan. 414, 431, 264 P.3d 81 (2011); see, *e.g.*, *State v. Raskie*, 293 Kan. 906, 918, 269 P.3d 1268 (2012) (finding prosecutor's misstatement did not affect the outcome of the trial in light of the entire record)."

As recounted above, the State presented overwhelming evidence (*e.g.*, five eye-witnesses who identified Killings as the shooter and DNA evidence linking Killings to the ammunition magazine discovered outside of McCray's apartment door) establishing that Killings intentionally and with premeditation murdered Jackson inside McCray's apartment. Based on this evidence, we can conclude that there is no reasonable possibility that the single improper comment in the prosecutor's closing argument affected the verdict. Accordingly, we conclude that the prosecutor did not commit reversible misconduct.

RIGHT TO BE PRESENT

Killings argues that an exchange between the district court judge and the jury foreman violated his constitutional and statutory rights to be present at all critical stages of his criminal prosecution. A claim that a defendant was deprived of his or her statutory

32

and constitutional rights to be present during a portion of the trial raises legal questions that are subject to unlimited review on appeal. *State v. Engelhardt*, 280 Kan. 113, 121, 119 P.3d 1148 (2005).

During a break while the jury was deliberating, the judge advised the attorneys and Killings of the following:

> "I will advise you that just before the jury foreman approached me after all of the jurors had left, and he said I don't know if I can ask you this question or not, and he said there are only three ways this can go, is that correct? And I really didn't answer him. I just nodded, and I just, he said, you know, guilty, not guilty or hung? And I said if you have a question, I would like for you to write it down for me in a question format on the form; and he said, well, I just wanted to bring this up not in the presence of everyone. We haven't discussed that as an issue, but he was thinking about it, and I told him that I would advise you of what he said and if, if he felt that it was necessary to, the Court would like that in a written form from him if you wanted to ask that question, but I did not give him any response."

Killings raised no concern about or objection to the judge's interaction with the jury foreman.

In his motion for a new trial, Killings argued that the judge's encounter with the jury foreman constituted a conference between the judge and juror which required Killings' presence. The district court filed a memorandum decision and order denying Killings' motion. In the decision, the district court recounted the interaction with the juror:

> "Just after jurors recessed for lunch, the Jury Foreman returned to Division 11, approached the Court and stated, 'I'm not sure if you can answer this question, but the way I see it is this thing could go three ways:  guilty, not guilty, or hung.' The Court

33

instructed the foreman to submit his questions to the Court in writing on the form provided by the Court. The foreman then stated that although he wanted to bring up this point to the Court, he did not want to do so in the presence of the other jurors. He added that jurors had not discussed the matter, but he had been thinking of it. The Court advised the foreman that the Court would inform the parties of his question and of the Court's instruction. That concluded the interaction. The foreman never submitted written inquiry about this topic."

The district court judge concluded that the exchange between the juror and herself did not constitute reversible misconduct.

A criminal defendant has a constitutional and statutory right to be present at all critical stages of his or her trial. See *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353, *reh. denied* 398 U.S. 915 (1970); K.S.A. 22-3405(1); *State v. Bolton*, 274 Kan. 1, 4-5, 49 P.3d 468 (2002). K.S.A. 22-3405(1) provides in relevant part: "The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law." This court has interpreted K.S.A. 22-3405(1) to mean:

"[A] felony defendant must be present at any stage of the trial when the jury is in the courtroom or when the defendant's presence is essential to a fair and just determination of a substantial issue. The statutory command of K.S.A. 22-3405(1) is analytically and functionally identical to the requirements under the Confrontation Clause and the Due Process Clause of the federal Constitution that a criminal defendant be present at any critical stage of the proceedings against him or her." *Engelhardt*, 280 Kan. 113, Syl. ¶ 2.

"It is well settled that a conference between a trial judge and a juror is a critical stage of the trial at which a criminal defendant has a constitutional right to be present." *State v. Mann*, 274 Kan. 670, 682, 56 P.3d 212 (2002). Furthermore, K.S.A. 22-3420(3)

34

requires that any question from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is voluntarily absent. See *State v. Bowen*, 299 Kan. 339, 353, 323 P.3d 853 (2014); *State v. King*, 297 Kan. 955, 967, 305 P.3d 641 (2013).

To classify the exchange that took place in this case as a "conference" requiring Killings' presence is tenuous at best. *Cf. Mann*, 274 Kan. at 680-81 (court found it was error for trial judge, outside presence of defendant, to formally question four jurors about trial spectator whose conduct was making them uncomfortable); *State v. Fulton*, 269 Kan. 835, 844-45, 9 P.3d 18 (2000) (court found it was error for trial judge, outside presence of attorneys and defendant, to question two jurors about misconduct occurring during deliberations); *State v. McGinnes*, 266 Kan. 121, 127-28, 967 P.2d 763 (1998) (court found it was error for trial judge to have an ex parte communication with the jury advising it about why a witness did not testify at trial); *State v. High*, 260 Kan. 480, 484-85, 922 P.2d 430 (1996) (court found it was error for trial judge, outside the presence of defendant, to question a juror about her business relationship with the victim's family); *Crease v. State*, 252 Kan. 326, 328-33, 845 P.2d 27 (1993) (court found it was error for trial judge to have an in chambers ex parte communication with at least one juror concerning juror's reluctance to apply felony-murder rule).

Here, the jury foreman voluntarily approached the district court judge and attempted to ask the judge a question. The judge's description of the encounter, when viewed in its entirety, indicates that the judge, by nodding, did not give an answer to the juror's question but simply acknowledged that she had heard the juror's question. The judge then proceeded to advise the juror of the proper procedure for submitting a question to the court. The juror, however, never submitted the question. Consequently, the statutory mandate of answering a jury's question in open court in the presence of Killings

was never implicated because the district court judge never gave an answer to the jury foreman's question.

Under the facts of this case, we conclude that the brief interaction the jury foreman initiated with the district court judge did not violate Killings' constitutional or statutory rights to be present at all critical stages of his criminal prosecution.

## CUMULATIVE ERROR

Next, Killings asserts that even if the issues that he has raised do not rise to the level of reversible error individually, the cumulative effect of these errors operated to deny him a fair trial, requiring reversal of his conviction.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. If the evidence is overwhelming against the defendant, however, no prejudicial error may be found based upon this cumulative error rule. *State v. Burns*, 295 Kan. 951, 960, 287 P.3d 261 (2012).

In the preceding analysis, we assumed the existence of one error—the district court's failure to instruct on second-degree intentional murder—and found the presence of another—the prosecutor's improper comment during closing arguments regarding Killings' decision to exercise his right to a jury trial. But based on the overwhelming evidence presented at trial establishing Killings' guilt for premeditated murder, we found both errors harmless. Considering the errors collectively, we conclude that they did not aggregate so as to deny Killings a fair trial. We reach this conclusion based on the errors being unrelated to one another and the overwhelming evidence presented at trial, which

36

included testimony from five eyewitnesses, establishing that Killings, with premeditation, murdered Jackson.

In light of the record as a whole, we conclude there is not a reasonable possibility the combined errors affected the outcome of the trial.

HARD 50 LIFE SENTENCE

After Killings was found guilty of premeditated first-degree murder, the State sought a hard 50 life sentence, alleging Killings knowingly or purposely killed or created a great risk of death to more than one person (risk of death aggravator). See K.S.A. 21-4636(b). The evidence presented at trial established that Killings shot at Jackson multiple times, hitting him once, while Jackson and four other individuals were inside McCray's bedroom. Citing this evidence, the district court found Killings risked the lives of more than one person when he shot at Jackson.

At sentencing, the State also asked that the district court consider Killings' actions while incarcerated and awaiting sentencing in determining whether to impose a hard 50 life sentence. Through the testimony of jail staff, the State presented evidence at sentencing that (1) Killings punched another inmate at the Shawnee County Detention Center; (2) he resisted officers' attempts to remove him from his cell and ultimately had to be tased (Killings' actions resulted in his sentencing hearing being continued to a later date); and (3) after being tased, jail staff searched Killings and found a shank tucked between two socks he was wearing on one foot. The district court judge stated that she also considered this evidence in imposing a hard 50 life sentence.

Now on appeal, Killings raises three arguments for why his hard 50 sentence should be reversed: (a) The aggravating factors used to impose the sentence should have

37

been proven to a jury beyond a reasonable doubt; (b) insufficient evidence supported the district court's finding of the risk of death aggravator; and (c) the district court erred in relying in part on a nonstatutory factor (behavior in jail while awaiting sentencing) to impose the hard 50 life sentence.

In *State v. Soto*, 299 Kan. 102, 120-24, 322 P.3d 334 (2014), this court analyzed Kansas' hard 50 life sentencing statute in light of *Alleyne v. United States*, 570 U.S. __, 133 S. Ct. 2151, 2155, 2160-63, 186 L. Ed. 2d 314 (2013). In *Alleyne*, the United States Supreme Court held that the right to a jury trial under the Sixth Amendment to the United States Constitution requires that any fact increasing a mandatory minimum sentence for a crime must be proved to a jury beyond a reasonable doubt. 133 S. Ct. at 2158. Applying *Alleyne*'s holding to the statutory hard 50 sentencing scheme, this court in *Soto* determined that the process allowing a judge to find the existence of one or more aggravating factors, instead of requiring a jury to find those factors beyond a reasonable doubt, violates the Sixth Amendment. *Soto*, 299 Kan. at 122-24.

In the present case, it is evident that the district court, pursuant to the statutory scheme then in place, made explicit factual findings that subjected Killings to an enhanced sentence. This was constitutional error. Based on *Alleyne* and *Soto*, we conclude that Killings' sentence was imposed in violation of his Sixth Amendment right to a jury trial. Because the State failed to argue on appeal whether the hard 50/*Alleyne* error in this case could be declared harmless, we refrain from addressing that issue. Accordingly, we must vacate Killings' hard 50 life sentence and remand for resentencing. Consistent with *Soto*, and *State v. Astorga*, 299 Kan. 395, 401-02, 324 P.3d 1046 (2014), we refrain from addressing whether the amended hard 50 sentencing statute, K.S.A. 2013 Supp. 21-6620, should be applied retroactively to Killings because such a question is not yet ripe for appeal. Accordingly, the decision in this case does not prevent the parties

38

from presenting their respective arguments to the district court at resentencing regarding application of the amended hard 50 sentencing scheme.

With regard to Killings' argument that insufficient evidence supported the district court's finding of the risk of death aggravator, in *Soto* we addressed Soto's claim that the evidence of the aggravating factor was insufficient, in which case remand would have been inappropriate under K.S.A. 2013 Supp. 21-6620(e). The *Soto* court stated: "While we decline to decide at this juncture whether Soto could be resentenced under the amended hard 50 sentencing statute, we find it prudent to address Soto's claim that the evidence of the aggravating circumstance was insufficient." 299 Kan. at 129. We followed this same approach in several subsequent cases. See *State v. Hayes*, 299 Kan. 861, 866-69, 327 P.3d 415 (2014); *State v. Lloyd*, 299 Kan. 620, 642-45, 325 P.3d 1122 (2014); *State v. DeAnda*, 299 Kan. 594, 602-05, 324 P.3d 1115 (2014); *Astorga*, 299 Kan. at 397-404; *State v. Hilt*, 299 Kan. 176, 201-06, 322 P.3d 367 (2014).

Recently, in *State v. Roeder*, 300 Kan. __, 336 P.3d 831, 859 (2014), we reexamined this line of cases and concluded that "[o]nce the court determined that Soto's sentence had to be vacated because of the unconstitutional sentencing scheme, the question of whether sufficient evidence existed to meet the requirements of the unconstitutional statute was rendered moot." In this case, like in *Roeder*, questions regarding the sufficiency of any aggravating factor evidence will be germane only if the prosecutor elects to seek resentencing of Killings under the retroactive provision of K.S.A. 2013 Supp. 21-6620(e). And if the prosecutor so elects, the evidence—and even the aggravating factors relied upon—may differ from what was previously presented. Consequently, "[w]hether the sentence might also have been subject to being vacated based upon an insufficiency of the evidence if the sentencing scheme had not been found unconstitutional is an academic question we need not answer." *Roeder*, 300 Kan. __, 336 P.3d at 859.

Consistent with our holding in *Roeder*, we do not address whether sufficient evidence supported the risk of death aggravator found by the sentencing court in this case. Furthermore, Killings' argument that the district court erred in considering a nonstatutory factor in imposing the hard 50 life sentence is rendered moot based on our decision to vacate his hard 50 life sentence and remand the case for resentencing.

LIFETIME POSTRELEASE SUPERVISION

Finally, Killings contends that the district court erred in imposing lifetime postrelease supervision as part of his life sentence for his off-grid, premeditated first-degree murder conviction.

This court has previously decided this issue in Killings' favor, stating that "'[a]n inmate who has received an off-grid indeterminate life sentence can leave prison only if the [Kansas Prisoner Review] Board grants the inmate parole. Therefore, a sentencing court has no authority to order a term of [lifetime] postrelease supervision in conjunction with an off-grid indeterminate life sentence.'" *State v. Summers*, 293 Kan. 819, 832, 272 P.3d 1 (2012) (quoting *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 [2011] ); see *State v. Harsh*, 293 Kan. 585, 590, 265 P.3d 1161 (2011) (parole is separate and distinct from the sentence; if defendant with hard 25 life sentence ever leaves prison, it will be because parole was granted).

Based on the above caselaw, the district court erred in imposing lifetime postrelease supervision. At resentencing, if Killings receives an indeterminate life sentence for his premeditated first-degree murder conviction, the district court should impose lifetime parole in conjunction with the indeterminate life sentence.

Killings' conviction is affirmed, sentence vacated, and case remanded with directions.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

_____

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 108,021 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals under the authority vested in the Supreme Court by K.S.A. 20-2616.