NOT DESIGNATED FOR PUBLICATION

No. 114,010

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAMIL MICHAEL FULTON,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed July 14, 2017. Affirmed.

*William K. Rork*, of Rork Law Office, of Topeka, for appellant, and *Jamil M. Fulton*, appellant pro se.

*Jodi Litfin*, deputy district attorney, *Kendall Kaut*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., PIERRON, J., and BURGESS, S.J.

*Per Curiam*:  A jury convicted Jamil Michael Fulton of first-degree murder and criminal possession of a firearm in 2006. The Kansas Supreme Court affirmed his conviction on direct appeal in 2011. *State v. Fulton*, 292 Kan. 642, 256 P.3d 838 (2011). In 2012, Fulton filed a motion pursuant to K.S.A. 60-1507 arguing his trial attorney, Kevin Cook, had provided ineffective assistance of counsel. The district court held an evidentiary hearing on the motion after which it denied Fulton's motion. Fulton appeals.

1

In November 2006, Fulton and his codefendant, Robert Patterson, were tried for the first-degree murder of Christopher Caraway. A jury found Fulton guilty of first-degree murder and criminal possession of a firearm. The jury was unable to reach a verdict regarding Patterson. The district court sentenced Fulton to life imprisonment without the possibility of release for 25 years—a hard 25. The following facts are taken from the Kansas Supreme Court's ruling on Fulton's direct appeal:

"Caraway was a member of a subdivision of the Cripps gang. Fulton was a member of the Traveling Vice Lords gang.

"On Saturday, July 16, 2005, Officer Charles Nadeau of the Topeka Police Department saw Caraway at a Mexican fiesta in the Oakland area of Topeka, Kansas. Several months earlier, Caraway had told Nadeau that he was leaving town because of a 'bad deal that he had made.' At the fiesta, Nadeau asked Caraway why he was back in town. Caraway answered that he was just back in town over the weekend to visit family, that he had not resolved the earlier situation, and that some members of the Traveling Vice Lords gang were looking for him.

"Later, at the fiesta, there was a run-in between Caraway's friend, Antony Sullivan, and Antuan Harness. Sullivan told Harness that he wanted to fight him. A group of people gathered, including Fulton, Rashawn Anderson, and Caraway. Caraway also offered to fight; however, the police dispersed the group before a fight broke out.

"On July 17, 2005, Caraway and his friend, Leonardo Martinez, were visiting Jasmine Phelps at the Highland Park Apartments in Topeka. Shortly before midnight, Caraway and Martinez left Phelps' residence and were walking the short distance to Martinez' residence when a group of people approached and started shooting at them. Martinez and Caraway ran in different directions in an attempt to flee the shooters. Martinez returned to the Phelps apartment and told Phelps and her little brother some of the people that Caraway saw at the fiesta were shooting at Caraway and him. Martinez, however, was never able to identify the shooters.

"On the morning of July 18, Caraway was found dead in a parking lot near where Martinez and he had separated when the shooting began. He died of a single bullet wound to his back that was approximately 9 mm in size. Police marked multiple bullet holes and recovered bullet fragments and casings from the crime scene. In processing the crime scene, it was concluded that at least three different weapons were used in the shooting.

2

"Several neighbors testified to the events surrounding the shooting. One neighbor, Latonya Boyd, explained that she did not see the shooters, but she heard multiple gunshots. Shortly after hearing the gunshots, she saw two cars, a red-colored one and a champagne-colored one, quickly leaving the area in the same direction. Another neighbor, Gary Johnson, stated his wife, Koren Johnson, woke him up because she heard gunshots. He ran to the front window and looked out onto the parking lot. He saw three black men chasing another black man, and two of the men were also shooting at the man being chased. He then saw all three men return, and the two shooters got into a red Pontiac Grand Am, while the third man got into a silver or grayish Dodge Stratus. The cars then left in the same direction. Gary Johnson further explained that he never saw the man who got into the Dodge Stratus fire a weapon, although Johnson heard gunfire before he looked out the window.

"Koren Johnson testified that early Monday, July 18, around 12:45 to 1 a.m., she heard 6 to 10 popping noises. She thought the noises were gunshots. She got out of bed to look out her front window. She noticed four black men running in front of her apartment. She recognized Robert Patterson as the second person running by. She did not recognize any of the other men.

"Other witnesses provided additional details. Tranice Nance was at the Highland Park Apartments partying with Fulton and others. She became drunk and high, and she then went to her car—a metallic gray Dodge Intrepid—to listen to music. While in the car, she heard gunfire. She scrunched down in the seat and then Fulton jumped into her car and said, 'People are shooting, let's go.' She then drove away.

"Lindsay Wenniham was also in the neighborhood of the Highland Park Apartments at the time of the shooting. She owns a red Pontiac Grand Am. She was with her boyfriend, Lindsey Wallace, who was there to deal drugs to Fulton. Wenniham was sitting in the front passenger seat of her car when she heard gunshots. Soon after, Wallace jumped into the driver's seat of her car and began backing out to leave, Anderson jumped into the car, and they drove away.

"Wallace was the only individual who testified that he actually saw the shooting take place. Wallace testified that he was rolling a blunt with Fulton when he saw Caraway with another person. Someone yelled, 'There's Chris,' and people started shooting. According to Wallace, as Caraway ran off, Fulton, Harness, and Anderson chased after him. Fulton pulled out a gun and started shooting at Caraway. Wallace then jumped into Wenniham's car, started it, and backed up to leave. As he was backing up,

3

Anderson jumped into the car, and Wallace drove away. At the time that Wallace testified, he was facing drug charges. Wallace stated he was involved in on-going plea bargain negotiations for the drug charges and that he was testifying in hopes of receiving a plea bargain.

"Two additional witnesses, Alonzo Lax and Ian Hudson, testified that they heard Fulton discussing the murder and taking credit for shooting Caraway. Lax testified that he was hanging out at a friend's house when he overheard a conversation in which Fulton admitted to shooting Caraway. According to Lax, codefendant Robert Patterson, the other alleged shooter, was also there when Fulton said that he was one who shot Caraway. Lax was specifically asked on direct examination by the prosecutor if the codefendant 'Robert Patterson agreed that Jamil Fulton was probably the one that did it?' Lax answered the question in the affirmative without any objection by either Patterson or Fulton.

"Hudson testified that in December 2005, Fulton, he, and several other individuals were shooting dice at Kajun Jackson's house in Topeka. Hudson testified that there he overheard Fulton brag that he had shot Caraway in order to earn his gang stripes. Jackson, however, testified that no such conversation occurred. Both Hudson and Lax were testifying in order to receive favorable plea deals.

"Fulton presented testimony that Hudson and Lax were committing perjury in order to receive favorable plea deals. Robert Green testified that Lax was going to testify that Fulton committed the crime even though Lax 'didn't know for sure' who committed the crime. Green further testified that Lax told him he was not present at the shooting and his testimony would be what 'he'd hear from other people that Jamil did.' Further, Green testified that Hudson and Lax were together in the Shawnee County jail and spoke with each other to 'make stories together that match.'" *Fulton*, 292 Kan. at 643-46.

On November 30, 2006, Cook filed a motion for a new trial. He argued there was newly discovered evidence in the case. Specifically, the police had recovered three weapons 17 days after Caraway was murdered. Cook argued the KBI should analyze the weapons because the results could be potentially exonerating for Fulton. The State argued this was not newly discovered evidence because counsel for the two defendants had learned about the weapons during the trial. On January 3, 2007, the district court ordered

ballistic and fingerprint testing of the weapons before it would rule on the motion and set another hearing for February 8, 2007.

Fulton filed a motion for a new attorney. Later, Cook filed a motion to withdraw. At the hearing on February 8, 2007, the district court granted Cook's motion to withdraw and appointed Donald Hoffman to represent Fulton. The court declined to address the merits of the motion for a new trial at the hearing because of the change in Fulton's counsel. The State noted, however, that ballistics testing on the weapons was completed, and Cook had the results.

On July 18, 2007, Hoffman filed a supplemental motion for a new trial, arguing that Wallace and Lax had provided perjured testimony. On July 25, July 26, and September 21, 2007, the district court held a hearing on the motion for a new trial. Fulton presented several witnesses in support of his claim that Lax and Hudson had presented perjured testimony but did not present any evidence regarding the weapons.

The first witness to testify was Edwin Gaut. Gaut's cousin had a child with Fulton's sister. Gaut testified he was in the same module in the jail with Wallace and Lax. According to Gaut, Wallace told him that he and Lax had made up stories about Fulton in order to get their sentences reduced. These conversations happened around October 2006. Gaut told Fulton about them in January or February of 2007.

Ricky Stovall testified he was in jail with Lax and Hudson during September 2006. He claimed he overheard Lax and Hudson talking about how they were going to make up a story about Fulton in order to reduce the time for their charges. Neither of them had any factual information about the case, so they were just going to repeat what they had heard from others. Stovall testified that at one point after the trial, Fulton was in the same module as Stovall and Hudson. Stovall overheard Hudson tell Fulton he was changing his story.

5

Hudson testified he may have misheard Fulton claiming he killed Caraway on the night they were shooting dice. He talked to a detective about the information he had in June 2006. Prior to that, Hudson had not been in the same module with Lax or Wallace, so he could not talk to them about any information he might give to law enforcement. When he did speak with Lax about the case in jail, it was in the beginning of 2007 after they had both already testified at trial.

Lax testified he had not testified truthfully at trial. He had lied about being at the same house with Fulton and hearing him talk about killing Caraway. He stated he talked to Wallace about making up a story about Fulton. He did not talk to Hudson about the case until after both of them had testified. He denied he was ever in a module together with both Gaut and Hudson.

Two witnesses also testified that Fulton was not in Topeka during most of the fall of 2005. Maaya Amin, Fulton's girlfriend, and Akkean Johnson, Fulton's friend, both testified that Fulton was in Atlanta from mid-October to mid-December 2005.

Devry Knight testified he went to Jackson's house in December of 2005 with Hudson to see what another friend was doing. Knight stated he did not see Fulton at Jackson's house that night. He also admitted, though, that he did not go into the house, and he did not know who was inside.

On November 13, 2007, the district court denied Fulton's motion for a new trial. The court found Fulton had failed to present any evidence regarding the weapons at the hearing on the motion, so he had abandoned that issue. The court also denied the claims in Fulton's supplemental motion. The court held that the hearsay testimony presented was inherently unreliable because it required the court to determine the credibility of both the

testifying witness and the person who made the statements. Furthermore, the court found Lax' original testimony more credible than his recantation.

Fulton filed a direct appeal of his conviction arguing there was insufficient evidence to support his conviction. He also appealed the district court's denial of his motion for a new trial. The Kansas Supreme Court affirmed Fulton's convictions and the district court's denial of his motion for a new trial. *Fulton*, 292 Kan. 642.

On May 29, 2012, Fulton filed a motion pursuant to K.S.A. 60-1507. He claimed Cook had provided ineffective assistance of counsel because Cook failed to (1) properly advise him during plea negotiations; (2) request jury instructions on the lesser included offense of second-degree murder; (3) investigate ballistic evidence; (4) call key witnesses; and (5) object to prosecutorial misconduct. Fulton also brought several other claims which he does not raise on appeal.

The district court held an evidentiary hearing on March 8, 2013. Fulton testified at the hearing that Cook was ineffective as his trial counsel for a number of reasons. First, Cook had failed to properly advise him regarding plea negotiations. According to Fulton, Cook had not explained to him that he could be found guilty under a theory of aiding and abetting. Fulton only came to understand aiding and abetting after the jury found him guilty. If he had known about the possibility of being found guilty under a theory of aiding and abetting, he would have taken a plea.

Fulton testified that Cook met with him a couple times at the jail prior to trial. The meetings lasted about 15-20 minutes. Cook went over evidence and discovery with him at these meetings. Fulton told the court that a week before the trial started, he learned about Hudson's and Lax' statements. Fulton said he never spoke about a plea with Cook prior to learning about Hudson's and Lax' statements because he knew he was not the one who killed Caraway, and he thought that was what the prosecution had to prove. Fulton said at

that point he wanted to enter a plea agreement. The district attorney offered Fulton 13 years, but he turned it down. Fulton explained he turned down the offer because he did not kill the victim. Since he had not done what he believed the State had to prove, he was not willing to do 13 years for it.

After learning about Lax' and Hudson's statements, Fulton also said he told Cook he could provide witnesses who would testify he was out of town during October, November, and December 2005. These witnesses were Johnson, Amin, and his cousin, Kevin Fisher. He wanted to subpoena records to show that Hudson was incarcerated at the time he supposedly overheard Fulton claim he killed Caraway as well as records showing Wallace, Hudson, and Lax were all in jail together around March 2006. He admitted, though, that Cook did not really have enough time to review all that information. Fulton complained there was no ballistics expert for the defense, and no ballistics testing had been done on his behalf.

Fulton told the district court that during closing arguments the prosecutor made multiple improper statements. These included the prosecutor's comments about atonement, his comments about Fulton taking notes at the crime scene, and the prosecutor's implying that the witnesses were testifying of their own free will rather than because of plea bargains. Fulton stated Cook did not object to any of these comments. Fulton contended that Cook was ineffective for not requesting a jury instruction for second-degree murder when the court asked about instructions on a lesser included offense.

Cook testified that he discussed all of the evidence with Fulton in person as is his practice with all his criminal defense clients. When Cook first met with Fulton, Fulton told him he was not present at the shooting. Cook told Fulton that was an alibi defense and there were time constraints to file it with the court. Cook asked Fulton where he was at the time of the crime, and Fulton said he would get back to Cook about that. Fulton

8

never gave Cook any evidence he was somewhere else, and an alibi defense was not filed.

Cook produced his notes from his discussions with Fulton. The first set of notes was from a meeting where they discussed motions, whether there would be a plea deal, and theories of guilt the State might use, including a list of people who would place Fulton at the scene. The next set of notes covered premeditation, what an intentional crime was, and a list of witnesses and what their potential testimony might be. Cook also had a copy of the Kansas Sentencing Guidelines in which he highlighted where Fulton fell within the chart and the potential he might have for a plea bargain.

Cook testified he discussed the theory of aiding and abetting with Fulton on multiple occasions. He said he explained to Fulton that the State did not have to prove Fulton actually fired the bullet that killed Caraway, only that he was engaged in the same activity at the same time. According to Cook, Fulton had a great deal of difficulty understanding how he could be convicted if the State was charging three people with the same act.

Cook stated that up until the eve of trial, Fulton maintained he did not want to engage in any plea negotiations. The State had discussed possible plea deals with Cook, but Fulton had not been interested. The Friday before trial was to begin, Fulton became interested in working out a plea bargain. Cook attempted to negotiate a deal, and the State eventually offered Fulton 13 years. Cook presented the offer to Fulton, but Fulton rejected it.

Cook testified he had difficulty preparing for trial because Fulton did not assist him. Fulton had sent Cook a letter saying he did not want Cook to subpoena any witnesses. Cook said he found this alarming because of the seriousness of the charges. Cook then visited Fulton in jail, and Fulton signed a handwritten document saying he did

9

not want Cook to subpoena any witnesses on his behalf. Despite these notices, Cook still prepared for trial and located witnesses to call on Fulton's behalf. Cook said he made a tactical decision not to call a ballistics expert because he did not believe it would produce any benefit to the defense.

Cook stated that while the jury was deliberating, he asked Fulton if he was satisfied with Cook's representation. At that time, Fulton said he was. After the trial, Fulton filed a motion to have Cook removed. The district court denied that motion and their relationship continued to deteriorate. Cook eventually filed a motion to withdraw as counsel.

In rebuttal testimony, Fulton said he did not want Cook to subpoena any of the witnesses that the State might call as witnesses. The list of the State's potential witnesses included Fulton's grandmother, and he did not want Cook to subpoena his grandmother. He did not intend his request to include witnesses Fulton had told Cook to call on his behalf. Cook responded his understanding after meeting with Fulton in jail was that Fulton did not want him to subpoena any witnesses.

The district court denied Fulton's motion. As for the plea negotiations, the court found Cook had properly advised Fulton as to the manner in which the State could prove its case, and Fulton voluntarily rejected the plea offer without reliance on any inaccurate advice from Cook. As for the jury instructions, the court found that Fulton had not provided any evidence that a charge of second-degree murder would have been proper in his case.

As for the claim that Cook failed to call witnesses, the district court found that Fulton had failed to establish either prong of the standard under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). First, Fulton had specifically instructed Cook not to subpoena witnesses on

his behalf. Despite this order, Cook had prepared witnesses to testify for the defense. Additionally, all of Fulton's defense arguments were presented during the trial. The court also found that Cook made a strategic decision that an independent ballistics expert would not controvert the State's witnesses. The court also noted Fulton had not identified any conflicting evidence or theory of defense that went unargued because Cook did not employ a ballistics expert.

Finally, the district court found that Cook was not ineffective for not objecting during the State's closing arguments because the State's comments did not amount to prosecutorial misconduct. In conclusion, the court found Cook had provided Fulton with capable representation through all critical stages of the trial. Fulton appeals.

*Ineffective Assistance of Counsel*

On appeal, Fulton argues Cook was ineffective for failing to properly advise him about the concept of aiding and abetting during plea negotiations. He maintains he would not have rejected the State's plea offer if he had understood the State could secure a conviction for first-degree murder on a theory of aiding and abetting. The State argues Cook adequately represented Fulton during the plea process and Fulton has not shown Cook was ineffective in how he explained aiding and abetting. Additionally, the State asserts Fulton has not established there is a reasonable probability he would have accepted the plea if he understood aiding and abetting and if the court would have accepted the plea.

*Standard of Review*

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2017 Kan. S. Ct. R. 222). An appellate court reviews the

court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013).

A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. When the district court conducts a full evidentiary hearing on such claims, the appellate courts determine whether the district court's findings are supported by substantial competent evidence and determine whether the factual findings support the court's legal conclusions. The appellate courts apply a de novo standard to the district court's conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, *i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882-83, 335 P.3d 1162 (2014) (relying on *Strickland*, 466 U.S. at 687).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. See *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014).

A defendant's right to counsel under the Sixth Amendment to the United States Constitution extends to the plea-bargaining process, and a defendant is entitled to the effective assistance of competent counsel during plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012); *State v. Szczygiel*, 294 Kan.

12

642, 646, 279 P.3d 700 (2012). At a minimum, counsel has a duty to advise a defendant as to the range of possible penalties and discuss the choices available to the defendant during the plea negotiation process. *State v. White*, 289 Kan. 279, 285-86, 211 P.3d 805 (2009). In the context of pleas, a defendant must show that the outcome of the plea-bargaining process would have been different with competent advice in order to establish prejudice. *Lafler*, 566 U.S. at 163. When the alleged incompetent advice led to the rejection of a plea offer, the prejudice alleged is having to stand trial. See 566 U.S. at 163-64. In such circumstances,

> "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." 566 U.S. at 164.

At both the district court level and the appellate level, Fulton has failed to allege, let alone prove, the district court would have accepted the terms of his plea offer. The final plea offer from the State is not even in the record. The only information available about the plea is that the State offered 13 years' imprisonment. Thus, Fulton has arguably failed to establish prejudice under the standard in *Lafler*.

As for Fulton's specific claim, Fulton and Cook provided conflicting testimony at the K.S.A. 60-1507 hearing. Fulton stated Cook had never explained aiding and abetting to him. Cook said he explained aiding and abetting multiple times, but Fulton had difficulty understanding the concept. The court resolved the evidentiary conflict in favor of Cook. Fulton does not challenge this fact-finding on appeal. Furthermore, appellate courts do not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *Drach v. Bruce*, 281 Kan. 1058, 1067, 136 P.3d 390 (2006). Therefore,

13

for the purposes of this analysis, Cook explained aiding and abetting to Fulton multiple times but Fulton had trouble understanding.

Fulton argues that we should equate his misunderstanding with counsel giving erroneous legal advice because the effect is the same—his decision to reject the plea was not voluntary. This argument leaves out a critical connection necessary for ineffective assistance claims—counsel's performance must cause the defendant to reject the plea and that performance must fall below an objective standard of reasonableness. See *Lafler*, 566 U.S. at 164; *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007). Here, Cook explained aiding and abetting multiple times to Fulton. Not only that, the record indicates he provided all the information Fulton needed to make a decision on his plea, including possible sentences and evidence the State might present at trial. Furthermore, Cook negotiated a plea deal at Fulton's request.

Moreover, Fulton did not want to enter a plea until 3 days before the start of trial. At that point, Cook sent a plea offer to the State. The State rejected that offer and sent a counteroffer. Fulton argues that Cook should have asked for a continuance in order to have more time to explain the concept of aiding and abetting to Fulton. But there is no way to know if the district court would have granted a continuance. Additionally, there is no way to know if Cook could have explained aiding and abetting to Fulton in a way that would have made him understand in whatever period of time the court would have given him.

Ineffective assistance of counsel claims involving the rejection of a plea generally allege counsel provided erroneous legal advice regarding the wisdom of accepting a plea or the likelihood of success at trial. See *Lafler*, 566 U.S. at 161 (defendant rejected plea after counsel allegedly convinced him prosecution would be unable to prove intent in homicide case); *Quinton v. State*, No. 112,439, 2015 WL 7693691, at *9-10 (Kan. App. 2015) (unpublished opinion), *rev. denied* 305 Kan. 1252 (2017) (defendant rejected plea

14

after counsel "talked [him] out of accepting it" because counsel believed he could win at trial). Fulton has not alleged that Cook advised him to reject the plea. Nor has he claimed Cook made any erroneous statements regarding his chances of success at trial that caused him to reject the State's plea offer.

In support of his argument, Fulton cites *State v. Sanchez-Cazares*, 276 Kan. 451, 78 P.3d 55 (2003). In that case, a defendant tried to withdraw his guilty plea before sentencing, claiming he did not make the plea knowingly. He claimed he did not speak or comprehend English well enough to understand the terms premeditated and intentional.

The *Sanchez-Cazares* court found the record undermined the defendant's claims. The defendant's interpreter testified counsel had properly advised the defendant regarding the meaning of premeditation, and the defendant understood it at the time of his plea. The interpreter testified the defendant had questions regarding the meaning of intentional, and counsel used an analogy to explain the concept to him. The defendant testified counsel explained the meaning of intentional to him, but he simply refused to accept the meaning of the term. The *Sanchez-Cazares* court found the defendant did not agree with the legal meanings of the terms premeditated and intentional, but this did not equate to a lack of understanding and did not support the withdrawal of his plea. 276 Kan. at 454-55.

Fulton argues that unlike the interpreter in *Sanchez-Cazares,* Cook acknowledged Fulton had difficulty understanding the concept of aiding and abetting. As the State points out, though, *Sanchez-Cazares* is distinguishable. In *Sanchez-Cazares*, the defendant had entered a guilty plea, and a defendant can only enter a guilty plea if he or she does so voluntarily with an understanding of the charges against him. K.S.A. 22-3210(a)(3). There is no similar requirement for rejecting a plea.

Ideally, a defendant would fully understand all legal terms and concepts before deciding to reject a plea. As the movant, however, Fulton has the burden to prove Cook's

15

performance fell below an objective standard of reasonableness. *Fuller*, 303 Kan. at 486. The record indicates Cook thoroughly covered evidence, theories of guilt, and possible sentences with Fulton before Fulton decided to reject the plea offer. Fulton does not point to any legally erroneous advice which Cook gave to him and on which he relied in rejecting his plea. As such, Fulton has failed to demonstrate Cook performed deficiently in this regard.

*Prosecutorial Misconduct*

Fulton argues Cook was ineffective for failing to object to prosecutorial misconduct during closing arguments. The district court concluded that the State's comments did not constitute misconduct and therefore Cook was not ineffective for failing to object. Fulton argues the following comments made during closing arguments were improper:

- The State inflamed the passions of the jury, asked for justice for the victim, and used a golden rule argument when it stated:

   "W.H. Auden once wrote 'Murder is unique as it abolishes the party it injures so that society has to take the place of the victim and, on his behalf, demand atonement. It is the crime in which society has a direct interest.'

   "On July 18, 2005, Christopher Caraway was murdered . . . . Everyone here in the courtroom in Shawnee County has a direct interest in that murder. You, as the jury, now have the power and the opportunity to demand atonement from those individuals involved in that murder.

   . . . .

   "Murder is unique in that it abolishes the party that injures it. Murder abolished Christopher Caraway.

   "The [S]tate simply would ask you to follow the oath you took . . . to give an honest look at the evidence, all the evidence, and determine that it fits; to exercise your

16

interest as members of this society in this murder, and to exercise your authority to demand atonement from the people involved."

- The State mocked Fulton when it stated:

"Yes, Anthony Sullivan testified his confrontation was with Antuan Harness and Rashan Anderson, and I appreciate [Patterson's counsel] at least giving some of the [S]tate's credibility that it was Rashan Anderson. Apparently, he's willing to pick that piece and believe that but ask you to disregard the rest, but if your attention is focused on [Antuan] Harness and Rashan Anderson, *do you think Mr. Fulton is there with his little steno pad taking notes of who else is in the crowd*, and since Anthony Sullivan says [he] did not see Jamil Fulton, that means Jamil Fulton wasn't there at the time of the altercation, but he was."

- The State commented on a witness' credibility when it stated:

"Mr. Green also says 'I have not spoken with Mr. Fulton in over a year,' and I ask you, then, how did Mr. Cook know to call him? You've heard from the [S]tate's witnesses. How do we know to call these witnesses? You spoke with Officer So and So, you spoke with Detective Randall. If he hadn't spoken to Jamil Futon in over a year, how did they know to call him as a witness? And why can't his story be checked out?"

- The State intentionally misstated the evidence or misled the jury regarding the inferences it may draw when it stated:

"[W]e have some people testifying under the hope of receiving some consideration . . . . Mr. Wallace does not have a deal. He has some idea of what the [S]tate's willing to recommend, if he testifies to what he knew. Ian Hudson does not have a deal. He has an idea of what the [S]tate's willing to recommend if he were to testify in this case. Alonzo Lax has entered his deal, and what a deal he got. 'Plea to the crime I'm charged with and I'm going to prison.' That's the same deal offered to Ian Hudson . . . . Lindsey Wallace is hoping to escape that fate, but that fate will be decided by a person in a black robe, and not by the [S]tate and not by Mr. Wallace . . . . We gave you the dates they provided their

17

information to Detective Randall. The consideration they're getting or may get or hope to get is not to get the information, it's not 'Cut me a deal and I'll tell you what I know.' They told Detective Randall what they know. The consideration that they may or may not get is to get them from Point A to Point B, and Point B is up on the witness stand, because, like anybody else, in the history of the American criminal justice system, when they've [been] charged with a crime, they have a right not to be compelled to testify, so the consideration they're offered or hope to get is to get them up here, testify to what they know. . . . To stand up here and argue you can't believe them because they're testifying in hopes of receiving some consideration, you should demand more than that, you've known all along they were going to testify in the hopes of receiving some consideration. You promised and agreed that you would listen to what they have to say and see if it fits with all the other evidence. That's what the [S]tate is asking you to do, to consider all of the evidence that you have heard, the witnesses who have nothing to gain, the witnesses whose job it is to be here, the witnesses who hope to gain something from this system, consider all of it in making your determinations about credibility."

First, Fulton has arguably failed to adequately brief this issue. While he spends a great deal of time explaining how the State's comments constitute prosecutorial misconduct, he spends little to no time explaining how Cook's failure to object amounts to ineffective assistance of counsel. He does not apply the *Strickland* standard in his analysis and simply concludes Cook was ineffective because he did not object.

Even assuming, arguendo, that Cook's performance was deficient for failing to object, Fulton cannot establish prejudice. An appellate court will review a claim of prosecutorial misconduct made during closing arguments even when there was no contemporaneous objection at trial. *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). The standard of review is the same regardless of whether the defendant objected or not. *Moncla v. State*, 285 Kan. 826, 832, 176 P.3d 954 (2008). Kansas courts have repeatedly denied relief to defendants for this claim based on an inability to demonstrate prejudice. See, *e.g.*, *Moncla*, 285 Kan. at 832; *Crowther v. State*, 45 Kan. App. 2d 559, 571, 249 P.3d 1214 (2011); *LaPointe v. State*,

18

42 Kan. App. 2d 522, 545-46, 214 P.3d 684 (2009). Because Fulton cannot demonstrate Cook's failure to object prejudiced him, his claim fails.

*Jury Instructions*

Fulton argues Cook was ineffective because he did not request an instruction for the lesser included offense of second-degree murder. He argues there was insufficient evidence of premeditation, as well as insufficient evidence he was an aider and abettor. He contends the failure to give an instruction on second-degree murder was clearly erroneous, and Cook was ineffective for failing to request it.

The State argues Fulton is improperly attempting to raise a trial error in a K.S.A. 60-1507 motion. It contends Fulton should have raised the jury instruction issue on direct appeal, and he has not provided an explanation why we should allow him to do so now. It also asserts Fulton has failed to apply the *Strickland* standard in his analysis. The State argues there was no evidence to support the giving of an instruction on second-degree murder, thus the failure to give such instruction did not prejudice Fulton.

The State is correct that a proceeding under K.S.A. 60-1507 ordinarily may not be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal. Supreme Court Rule 183(c)(3) (2017 Kan. S. Ct. R. 222). In this case, however, Fulton is bringing an ineffective assistance of counsel claim based on a failure to request jury instructions. As part of the ineffective assistance analysis, we must determine the appropriateness of a lesser included offense instruction. In doing this analysis, this court has previously asked whether there was any evidence in the record that could reasonably support a verdict on the lesser included offense. See, *e.g.*, *Tatum v. State*, No. 110,299, 2015 WL 4486775, at *10 (Kan. App. 2015) (unpublished opinion); *Davis v. State*, No. 89,688, 2004 WL 794437, at *4 (Kan. App. 2004) (unpublished opinion).

First-degree premediated murder is "the killing of a human being committed . . . [i]ntentionally and with premeditation." K.S.A. 21-3401. Second-degree intentional murder is "the killing of a human being committed . . . [i]ntentionally." K.S.A. 21-3402. "Second-degree intentional murder is a lesser included offense of premeditated first-degree murder because the only difference between the two crimes is the element of premeditation." *State v. Killings*, 301 Kan. 214, 222, 340 P.3d 1186 (2015). "Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation." 301 Kan. 214, Syl. ¶ 2. The State may establish premeditation by circumstantial evidence. Factors to consider in determining if circumstances give rise to an inference of premeditation are: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) the threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. 301 Kan. at 223-24.

Fulton argues the State did not present overwhelming evidence of premeditation. He admits that Sullivan and Caraway both told Harness they wanted to fight him at the fiesta, but there was no evidence that anything said at the fiesta applied outside of that particular incident. He states that nobody made any specific threats toward Caraway, and there was no evidence he or anyone else went to Highland Park Apartments on the night of the shooting to get revenge.

A review of the record, however, shows the State provided extensive evidence of premeditation. Caraway died in an incident involving multiple shooters firing multiple rounds as they chased Caraway across a parking lot. There was no provocation on the part of Caraway at the time the shooting started. In fact, Martinez testified a group of men were standing in the parking lot of the Highland Park Apartments when they went to visit

20

their friend. Caraway told Martinez the group of men in the parking lot were the same ones he had gotten into an argument with at the fiesta. According to Martinez, he and Caraway intentionally walked past the group of men standing in the parking lot without looking at them or saying anything in order to avoid a confrontation.

Several witnesses also testified that Fulton and Caraway were both involved in an argument at the fiesta shortly before the shooting. Officer Nadeau testified Caraway was a member of the Cripps. Caraway had told Nadeau he was having trouble with the Traveling Vice Lords. Other witnesses testified that Fulton was associated with the Traveling Vice Lords.

Additionally, Lax and Hudson both testified they heard Fulton claim he was responsible for killing Caraway. Hudson testified that Fulton was essentially bragging and claimed he killed Caraway in order to gain status in his gang.

Moreover, Fulton did not provide any evidence at trial that would reasonably support the conclusion that the shooting was intentional but not premeditated. Fulton's defense was that he was not involved in the shootings. He did not present evidence of an alternative motive or explanation for the shooting. See, *e.g.*, *Tatum*, 2015 WL 4486775, at *8-10 (finding defendant's counsel not ineffective for not requesting second-degree murder instruction when there was no evidence to support that murder was anything but premeditated).

In his brief, Fulton mainly argues there was insufficient evidence to convict him for first-degree premeditated murder on a theory of aiding and abetting. As the State points out, however, these are reasons Fulton would not be guilty of first-degree murder, not reasons he was entitled to an instruction on second-degree murder. He does not point to any evidence that would have supported a conviction for second-degree murder. In the absence of evidence that could have reasonably a supported a conviction for second-

21

degree intentional murder, Fulton was not entitled to such an instruction, and there is not a reasonable probability the outcome of his trial would have been different. Thus, Cook was not ineffective for failing to request a jury instruction for this lesser included offense.

*Ballistics Evidence*

Fulton argues Cook was ineffective for failing to have the ballistics evidence investigated by an expert. The State argues Cook made a strategic decision not to investigate the ballistics evidence. Furthermore, it asserts Fulton has not demonstrated prejudice because he has not established what an expert would say.

At trial, Amy Coody, a firearm and tool mark examiner for the KBI, provided testimony for the State regarding ballistics evidence. Coody examined a bullet, a bullet jacket fragment, and four shell casings recovered from the scene of the shooting. She did not examine the bullet that killed Caraway, though she would have been able to if the State had requested it.

Coody testified one of the recovered shell casings was a .22 caliber while the other three were 9 mm. Because the .22 and 9 mm casings could not have been fired from the same weapon, the shooters used at least two weapons. Coody also testified the bullet recovered from the scene was a 9 mm bullet. The markings on the bullet and the markings on the bullet jacket fragment indicated they were fired from different guns. The bullet jacket could not have come from a .22, though, because .22 caliber bullets do not have hard metal jackets similar to the fragment. Thus, according to Coody, if the bullet, bullet jacket fragment, and shell casing were all fired on the night of the shooting, the shooters used at least three different firearms.

22

The coroner testified that Caraway was killed by a 9 mm bullet, and that bullet could have been fired by a 9 mm gun, a .38 gun, or a .357 gun. Coody testified a 9 mm bullet could only have been fired from a 9 mm gun.

In his motion for new trial, Fulton argued he had newly discovered evidence. Specifically, the Topeka Police Department had seized three weapons from Angelique McNaughten while Fulton's codefendant, Patterson, was present. The weapons were a Black Hi-Point .380 ACP handgun, a Blue Colt Python .357, and a wood-stocked SKS rifle. The police had seized the weapons on August 3, 2005, several weeks after the shooting, but the weapons had been entered into evidence under a different case number. Cook and Patterson's attorney did not become aware of the weapons until after the trial began.

Fulton appears only to argue that Cook was ineffective at trial for failing to have a ballistics expert examine the shell casings and spent projectiles. In his argument, though, he references the newly discovered evidence of the three weapons introduced in the motion for a new trial and Cook's failure to have those weapons tested. He even goes so far as to assert the outcome of the trial may have been different if Cook had tested the evidence discovered after the trial. Thus, it is unclear if Fulton also wishes to argue Cook was ineffective in his representation at the motion for a new trial.

Even if Fulton does wish to include this claim, it likely fails. Cook originally represented Fulton on his motion for a new trial, but he withdrew his representation before the court's ruling. The record indicates testing of the weapons was completed before Cook withdrew. At a later evidentiary hearing on the motion, Fulton's new attorney did not present any evidence or argument regarding the weapons. The district court found that Fulton abandoned the issue by failing to present anything regarding the newly discovered evidence.

23

As for Cook's representation at trial, counsel's strategic decisions made after a thorough investigation are virtually unchallengeable, but strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (citing *Strickland v. Washington*, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

Fulton argues Cook was ineffective because ballistics testing was necessary to determine whether it would assist the defense. He suggests independent ballistics testing might have determined that only two weapons were involved in the shooting. According to Fulton, this evidence likely would have resulted in his acquittal, but he does not explain how this evidence would have supported his defense at trial. He mainly contends the three witnesses directly implicating him in the crime were not credible. Wallace was not credible because he was only testifying in order to get a plea deal. Lax and Hudson were not credible because they later recanted their testimony. According to Fulton, the ballistics evidence was the only objective evidence, and Cook should have investigated a way to counter it.

As the State points out, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. 86, 111, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). Additionally, "[I]n many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." 562 U.S. at 111. In this case, Cook did not present evidence to directly counter Coody's testimony. He did, however, cross-examine her to expose weaknesses in her presentation, including that no one had conducted an investigation to determine if the bullet that killed Caraway matched the bullet found at

the scene. In closing statements, Cook emphasized that the bullet that killed Caraway was never analyzed by the KBI, and that was a source of reasonable doubt.

Additionally, the ballistics evidence was not key to the State's case. It did not directly link Fulton to the crime scene or establish his role in the shooting. As Fulton himself argues, it did not even establish the number of shooters because one shooter could have used more than one weapon. The testimony from Wallace, Lax, and Hudson was much more damaging, and Cook's time was likely better spent finding witnesses who could undermine their credibility, such as Green and Jackson.

Even if Cook's performance was deficient, Fulton cannot establish prejudice. Fulton's theories on what ballistics testing may have shown are speculation, and mere speculation is not enough to demonstrate a reasonable probability the trial would have had a different result. See *Friday v. State*, No. 115,234, 2016 WL 6920369, at *4 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* December 20, 2016 (finding ineffective assistance claim did not warrant evidentiary hearing because defendant provided "nothing besides speculation . . . concerning how an expert would have changed the outcome of the trial); *State v. Chavez*, No. 114,458, 2016 WL 5867484, at *14 (Kan. App. 2016) (unpublished opinion), *rev. denied* June 20, 2017 (speculation on what witness may have testified to insufficient to establish prejudice); *Haskin v. State*, No. 90,252, 2004 WL 292113, at *1 (Kan. App. 2004) (unpublished opinion) (mere speculation that investigation of rape victim's sexual history may have provided material to impeach credibility did not establish prejudice).

In support of his argument, Fulton cites to a number of cases in which courts have found counsel ineffective for failing to investigate conflicting evidence or evidence central to a theory of defense. In those cases, however, the basic nature of the evidence was known to both counsel and the reviewing courts. See *Soffar v. Dretke*, 368 F.3d 441, 472-73 (5th Cir. 2004) (counsel failed to interview witness who confessed to committing

25

crime); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (counsel failed to interview eyewitness who provided statements to police that contradicted inculpatory evidence against defendant); *Sims v. Livesay*, 970 F.2d 1575, 1580 (6th Cir. 1992) (counsel failed to investigate gunpowder evidence that conflicted with State's theory of the crime). Thus, the courts were able to assess the effect such evidence may have had on the outcome of the trial.

Fulton could have presented the results of ballistics testing at his evidentiary hearing to demonstrate how those results would have supported his defense. See, *e.g.*, *Ludlow v. State*, 37 Kan. App. 2d 676, 680, 157 P.3d 631 (2007) (presenting testimony from ballistics expert at K.S.A. 60-1507 motion hearing). Alternatively, Fulton could at least have had an expert testify as to what the ballistics testing could have shown, *e.g.*, whether ballistics testing could determine only two weapons were used. Because he did not do so, it is difficult to determine what effect, if any, additional testing would have had on the outcome of the trial. Consequently, Fulton has not sustained his burden to demonstrate Cook's performance prejudiced him.

*Witnesses*

Fulton argues Cook failed to investigate and present witnesses that Hudson and Lax were lying on the stand. While Cook presented some witnesses to undermine Hudson's and Lax' credibility, Fulton contends there were many more witnesses Cook could have called as well as some documentary evidence to corroborate those witnesses. Fulton argues Cook could or should have called Gaut, Stovall, Amin, Johnson, and Knight, who all testified at the hearing on Fulton's motion for a new trial, as well as Fisher and Jazek Downey. The State asserts Cook made effective decisions regarding what witnesses to call given that Fulton was not helpful in preparing his defense. Additionally, the State argues Cook presented all of Fulton's defenses to the jury, and Fulton's proposed witnesses would all have been cumulative.

At trial, two witnesses—Lax and Hudson—testified they overheard Fulton claim responsibility for killing Caraway. Lax testified he was at Anderson's girlfriend's house around September 2005, a few months after the shooting. Fulton, Patterson, Harness, and Anderson were arguing about who actually killed Caraway, and they decided it was Fulton. According to Lax, Fulton said he started shooting last with a 9 mm. Lax said Fulton claimed they were shooting at Caraway because of an incident at the fiesta. Lax also testified he was at the fiesta, and Fulton had words with Caraway.

Hudson testified he was at Jackson's house one night in November or December 2005 shooting dice with Fulton, Anderson, Knight, Jackson, and Downey. Anderson and Fulton agreed they killed Caraway and were basically bragging. Hudson overheard Fulton say he killed Caraway for gang status.

"'[T]he decisions on what witnesses to call, whether and how to conduct cross-examination, . . . and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client. [Citation omitted].'" *State v. Johnson*, 304 Kan. 924, 951, 376 P.3d 70 (2016). Strategic decisions made after making a thorough investigation of the law and the facts relevant to the realistically available options are virtually unchallengeable. *Cheatham*, 296 Kan. at 437. The defendant bears the burden of proving counsel's alleged deficiencies were not the result of trial strategy. *Johnson*, 304 Kan. at 951.

First, Cook was not ineffective for not calling Gaut or Stovall because those witnesses did not come forward with relevant information until after the trial. At the hearing on the motion for a new trial, Gaut testified he did not tell Fulton what he knew until January 2007, which was 2 months after Fulton's trial. Similarly, Stovall did not even know who Fulton was until February 2007 and did not provide an affidavit until July 2007.

27

Second, the record indicates Fulton specifically asked Cook not to subpoena witnesses. Fulton sent Cook the following letter, stamped September 26, 2006:

"Hey Kevin it's me Jamil I just wanted to tell you remember when I said to [subpoena] everybody on the list, well I changed my mind don't do that ok cause I don't need my grandma in the court She has nothing to do with this. So let the court [subpoena] who they need ok. Thanks."

In the record there is another document stating:

"Fulton Jamil
Conference 10/10/06
1. Do not want grandmother to come to court
2. Do not want Kevin Cook to subpoena or arrange for any person to come to court to testify for Jamil Fulton
Would rather let the State call any witnesses
_____
Jamil Fulton
10/10/06 @ Shawnee County DOC"

The document appears to be signed by Fulton.

At the K.S.A. 60-1507 evidentiary hearing, Fulton testified he only meant Cook should not subpoena witnesses from the State's list. Cook testified his understanding was that he should not subpoena anyone. The document from October 10, 2006, supports Cook's recollection.

Despite Fulton's request that Cook not call any witnesses on his behalf, Cook called four defense witnesses: Deandre Duncan, Taquloshia Majors, Green, and Jackson. Duncan, a friend of Fulton's, testified that he went to the fiesta with Fulton, and by the

28

time they made it over to the group of people arguing, the police had already split the group up. The three other witnesses all provided testimony that undermined the credibility of Hudson's testimony. Majors, Fulton's sister, testified that Fulton was in Atlanta from mid-November until mid-December 2005. Green testified that he had been in Shawnee County Jail with Wallace, Lax, and Hudson. He overheard Wallace and Lax talking about the case and later heard Lax and Hudson collaborating so that their testimony at trial would match. Jackson testified that there was never a time when Hudson was at his house shooting dice and Fulton had said he killed Caraway.

Fulton lists a number of other witnesses he believes should have testified at trial. None of Fulton's witnesses have new information to offer, though. They all would have repeated or corroborated what other witnesses testified to at trial. "While defense counsel is considered ineffective for failing to call a witness when a witness would present the only defense available, it is not ineffective assistance of counsel to fail to call a witness whose testimony would only have been cumulative in nature." *Lewis v. State*, 33 Kan. App. 2d 634, 653, 111 P.3d 636 (2003). More importantly, their testimony would not have served to directly establish Fulton's innocence. Rather, they would only help to undermine the credibility of a single witness, Hudson, who claimed he had overheard Fulton admitting to the crime.

Fulton argues Cook should have called Amin, Johnson, and Fisher to testify at trial. All three would have testified Fulton was in Atlanta from mid-October until mid-December 2005. This would counter Hudson's testimony that he heard Fulton claim he killed Caraway sometime in November or December 2005. Their testimony would have been cumulative to Majors' testimony. Granted, Amin, Johnson, and Fisher would have testified that Fulton was in Atlanta for a slightly longer period of time. But this is unlikely to have prejudiced Fulton. Hudson never gave an exact date for the admission, and the testimony establishes that Fulton was in Kansas for part of December, which was within the possible time frame Hudson gave.

Fulton also contends Cook should have called Knight and Downey, who Hudson alleged were present when he overheard Fulton claim responsibility for Caraway's murder. At the motion for a new trial, Knight testified he went to Jackson's house with Hudson one night in December 2005 to see what Downey was doing. Knight did not see Fulton that night, but he did not go into the house and did not know who was inside. Again, this testimony would have been cumulative of Jackson's testimony that Hudson was never at a dice game at his house. Fulton does not proffer what Downey would have testified to, but presumably he too would testify Fulton did not confess during a dice game at Jackson's house.

Even if Cook's failure to call more witnesses was deficient performance, it did not produce prejudice. Hudson's testimony aside, there was still significant evidence of Fulton's guilt. Two witnesses put him at the scene of the crime, and Wallace testified he saw Fulton firing a gun at Caraway. Lax testified he heard Fulton claim responsibility for killing Caraway. Moreover, three defense witnesses provided testimony that impugned Hudson's credibility. Hudson also admitted he was testifying in hopes of receiving a plea bargain at trial. An additional five witnesses undermining Hudson's credibility is unlikely to have changed the outcome of the entire trial.

*Conclusion*

In conclusion, Cook provided effective assistance of counsel during Fulton's plea negotiations because he discussed the State's case, theories of guilt, and possible penalties with Fulton. He did not provide any legally erroneous advice that caused Fulton to reject the State's plea offer. He was not ineffective for failing to object to prosecutorial misconduct during closing arguments because the standard of review on appeal would have been the same even without a contemporaneous objection. Similarly, Cook was not ineffective for failing to request an instruction for second-degree murder because there

was no evidence that would reasonably support a conviction for that offense. Fulton failed to establish that Cook's decision not to investigate the ballistics evidence prejudiced him at trial. Lastly, Cook adequately presented witnesses in Fulton's defense at trial, and any other proposed witnesses would only have been cumulative.

Affirmed.